# ILLINOIS OFFICIAL REPORTS

---

### *Shinall v. Carter*, 2012 IL App (3d) 110302

---

| | |
|---|---|
| Appellate Court Caption | JESSICA SHINALL, Petitioner-Appellee, v. JEREMY CARTER, Respondent-Appellant. |
| District & No. | Third District<br>Docket Nos. 3-11-0302, 3-11-0436 cons. |
| Rule 23 Order filed<br>Motion to publish allowed<br>Opinion filed | November 9, 2011<br><br>January 5, 2012<br>January 5, 2012 |
| Held<br><br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | In proceedings on a paternity petition in which both parties sought an order regarding custody, support and visitation, and petitioner sought an order to remove the child to Colorado so she and the child could live with the Colorado resident she was to marry, the trial court's refusal to award joint custody was not against the manifest weight of the evidence where the court found the parties lacked the level of respect for each other necessary for joint custody to succeed and the record also supported the award of sole custody to petitioner, but the order granting removal of the child to Colorado was reversed where a reasonable visitation schedule could not be reached and petitioner failed to meet her burden of proving that removal was in the child's best interest. |
| Decision Under Review | Appeal from the Circuit Court of Peoria County, No. 10-F-31; the Hon. David J. Dubicki, Judge, presiding. |
| Judgment | Affirmed in part and reversed in part; cause remanded. |

| Counsel on Appeal | Richard W. Zuckerman (argued), of Law Offices of Richard W. Zuckerman, of Peoria, for appellant. |
|---|---|
| | Judith A. Serritella (argued) and Michael A. Fleming, both of Peoria, for appellee. |
| Panel | PRESIDING JUSTICE SCHMIDT delivered the judgment of the court, with opinion. Justices Lytton and O'Brien concurred in the judgment and opinion. |

**OPINION**

¶ 1    The respondent, Jeremy Carter, appeals from an order of the trial court denying joint custody and awarding his former girlfriend, Jessica Shinall, sole custody of their three-year-old daughter, Ava. Jeremy also appeals the trial court's order granting Jessica's petition for removal of Ava from Illinois to Colorado. We affirm in part and reverse in part.

¶ 2                                    FACTS

¶ 3    On September 26, 2008, Ava was born to Jessica and Jeremy, who lived together but never married. They separated in October of 2009. On January 14, 2010, Jessica filed a petition for paternity for an order declaring Jeremy the natural father of Ava. In his answer, Jeremy acknowledged paternity of Ava. Both parties requested an order regarding custody, support, and visitation. On April 27, 2010, a mediator's report indicated that there was no realistic likelihood of a mediated agreement. On June 15, 2010, Jessica filed a petition for leave to remove Ava from Illinois to Colorado, due to her recent engagement and upcoming wedding in August of 2010 to Nate Johnson, who resided in Colorado. Evidentiary hearings began on October 28, 2010, and continued through February 16, 2011.

¶ 4    At the hearings, evidence indicated that Jessica had sole custody of her 11-year-old son, Cesar, from her first marriage, which had been dissolved in December of 2003. In 2007, Jessica had earned her license to be a licensed practical nurse (LPN) and had had 8 jobs in the past 10 years. Jeremy had served in the Navy as a hospital corpsman from 1992 to 2003. After the Navy, Jeremy worked for Caterpillar from 2003 to the present and currently earned $78,336 per year plus medical and retirement benefits.

¶ 5    In January 2006, Jessica and Jeremy began dating. In October 2006, Jeremy, Jessica, and Cesar started living together in Chillicothe, Illinois. On April 13, 2007, Jeremy and Jessica became engaged to be married. On September 26, 2008, Ava was born, and both Jeremy and Jessica equally participated in her care. In October 2009, Jeremy and Jessica mutually agreed to separate due to disagreements regarding Cesar. Jessica moved two blocks away with Cesar and Ava. Without court intervention, the parties agreed upon a visitation schedule and child support. Jeremy paid $900 per month in child support in addition to half of Ava's day care.

Jeremy's visitation schedule coincided with Jessica working 12-hour shifts as an LPN on Tuesdays and Thursdays and every other weekend, from Friday to Sunday. On Tuesdays and Thursdays Jessica took Ava to day care at 6:30 a.m., Jeremy picked her up at 5 p.m., and Jessica picked her up from Jeremy at 8 p.m.

¶ 6　　On November 18 and 25, 2009, Jeremy's two grandmothers passed away. Unbeknownst to Jeremy, the same week Jessica began dating Nate Johnson. For a few months after their breakup Jeremy had attempted to reconcile with Jessica, sending her numerous text messages and e-mails. On one occasion he sent her over 100 text messages in 2½ hours. On January 7, 2010, Jeremy began crying uncontrollably while holding Ava and begged Jessica to get back together with him. In January 2010, Jeremy called Jessica's mother, crying uncontrollably. On January 8, 2010, Jessica obtained an emergency order of protection against Jeremy, which was dismissed after the parties entered an agreed civil restraining order prohibiting each party from harassing, abusing, or threatening the other.

¶ 7　　On November 23, 2009, Jessica had met Nate when he was in Illinois with his two sons visiting family members. Nate was in the Air Force and stationed in Colorado. He had joint custody of his two sons from a previous marriage, who resided with their mother in the same town as Nate, Colorado Springs, Colorado. After Nate and Jessica spent a few days together in November 2009, Nate left on deployment, and they continued to communicate long distance. They did not see each other again until March or April of 2010, and then tried to see each other once per month thereafter. In May of 2010, Jessica and Nate became engaged and married on August 10, 2010, in the Bahamas. On June 15, 2010, Jessica filed a petition to remove Ava from Illinois to Colorado. She also filed a similar petition to remove Cesar in a separate case.

¶ 8　　After they married, Nate remained in Colorado, while Jessica continued to reside in Illinois. Jessica had been to Colorado twice since meeting Nate. Ava spent time with Nate whenever he visited Illinois and during her visits to Colorado. Ava had been to Colorado twice for a total of one week. Jessica planned to move to Colorado to be a stay-at-home mother until Ava went to kindergarten.

¶ 9　　In February of 2010, Jeremy learned of Jessica's relationship with Nate by discovering their e-mails in an e-mail account that Jeremy had set up for Jessica. Jeremy learned of their engagement in May of 2010 through friends.

¶ 10　　In coparenting Ava, Jessica and Jeremy primarily communicated via text messages or e-mails, and spoke in person once per week. Since November 2009, they had sent each other hundreds or thousands of messages regarding Ava's care. Various e-mail conversations between Jeremy and Jessica were entered into evidence, demonstrating they were cordial to each other while discussing issues regarding Ava, such as visitation arrangements, clothing items, doctors appointments, medication, and medical bills. Jessica acknowledged that the e-mails were not threatening or harassing; she testified that the e-mails were "fantastic."

¶ 11　　Jessica testified that she did not believe that she and Jeremy could communicate well enough to share joint legal custody. Jessica cited, for example, that Jeremy was petty in his requests for specific clothing items to be packed for Ava, such as nice clothes for church or a swimsuit. Jessica felt Jeremy was being "nit-picky" when he pointed out a hole in Ava's sock. Jessica admittedly had taken Ava's wardrobe when she and Jeremy separated, but she

believed that Jeremy was responsible for maintaining his own wardrobe for Ava. Jessica testified that at an exchange of Ava, Jeremy took a jacket and pair of shoes that he had purchased off of Ava, explaining to her that was the way Jessica wanted things.

¶ 12    Jessica and Jeremy also disagreed as to the proper treatment for Ava's ailments, such as a diaper rash or chapped lips. Jessica had also disagreed with Jeremy bringing Ava to urgent care for a fever of 101.5 degrees and urine that smelled of ammonia, which he informed Jessica of afterward. Jessica thought Jeremy should have communicated with her prior to taking Ava to urgent care, although she admittedly had taken Ava to the doctor without consulting Jeremy.

¶ 13    According to Jessica's witnesses, Jeremy had made disparaging comments about Jessica and Nate in front of Ava. Specifically, Jessica's friend testified that Jeremy called her a "home wrecker" in front of Ava, which Jeremy denied. Jessica testified that on April 4, 2010, Jeremy called her an "F'ing whore" in front of Ava, which Jeremy denied. After that incident, both Jeremy and Jessica decided to bring witnesses to their exchanges of Ava.

¶ 14    In June 2010, Jeremy threatened to obtain a restraining order against Nate because he escorted Jessica to pick up Ava after Jeremy had requested that Nate not be present at exchanges due to the tension. Jessica testified that after Jeremy became upset at Nate's presence, Jeremy attempted to pull his storm door closed, but it was propped against Jessica's arm and she was holding Ava in that same arm. Nate testified that on July 6, 2010, Jeremy called him an "F'ing punk" and shoved Ava into Jessica's arms, which Jeremy denied. Jeremy admitted that on that date he had told Nate to "go screw himself." On November 16, 2010, Jeremy became irritated that Jessica's parents arrived at his home to pick up Ava wearing Air Force jackets from Nate. Jeremy video-recorded the incident in Ava's presence for evidence that Jessica's parents were intentionally attempting to provoke him.

¶ 15    Jessica's parents testified that Jeremy was not friendly with them when they picked up Ava and would not speak to them unless he had to relay information about Ava. Jeremy testified that but for relaying information about Ava, he did not want speak to Jessica's parents because "everybody [was] supporting taking [Ava] away" from him and he did not want to say anything that could be wrongly interpreted as him having the wrong tone or demeanor.

¶ 16    In January of 2011, Jessica informed Jeremy and Ava's day-care provider, Marilyn Geltmaker, that on Tuesday, January 11, 2011, her mother was going to pick up Ava from day care early and, implicitly, Jeremy was expected to pick up Ava from Jessica's mother. At 2 p.m. on January 11, 2011, Jeremy called Geltmaker indicating that he was picking up Ava as usual that day. At 4 p.m., Geltmaker allowed Jessica's mother to take Ava. The following day Jeremy informed Geltmaker that, on the advice of his lawyer, the next time Ava was not there when he was scheduled to pick her up he would call the police and report Ava as a missing person. Geltmaker quit her job as Ava's day-care provider to avoid future problems that could risk her day care being shut down. After Geltmaker quit, Jeremy's mother replaced Geltmaker as Ava's day-care provider on Tuesdays and Thursdays.

¶ 17    Geltmaker testified that she had followed Jessica's directions over Jeremy's because Jessica told her that she had sole custody of Ava. Geltmaker also testified that Jeremy was

-4-

critical of Jessica and had stated that he hated Jessica. Geltmaker indicated that Jeremy would often complain about items Jessica packed, or failed to pack, for Ava.

¶ 18    Annette Monge, a friend of Jeremy's, testified that she witnessed three to five exchanges of Ava between Jessica and Jeremy. Monge testified that Jessica and Nate were mean to Jeremy and laughed at him in a taunting manner in front of Ava. She observed a "smug" attitude from Jessica. After an exchange in May 2010, Jeremy was upset because Jessica handed Ava to him and instructed Ava to wave goodbye to "daddy" in reference to Nate.

¶ 19    Jeremy's supervisor testified that Jeremy's work performance was above and beyond that of the average worker. Jeremy's uncle, Kevin Orman, testified that he lived across the street from Jeremy and saw Jeremy almost daily. Kevin described Jeremy's extended family as very close and described Jeremy as a very loving and good person.

¶ 20    Jessica testified that she thought that Ava's life would be enhanced by moving to Colorado because she would be a stay-at-home mom to the couple's four children and Ava would be in a family environment. She also believed that Nate was an honest person, who was stable emotionally and financially. She noted that the school districts were good and the neighborhood was safe. Jessica did not look into the requirements of obtaining licensing for an LPN in Colorado.

¶ 21    Jessica's mother and father testified that Ava was a happy, well-adjusted, and healthy child. Jessica's mother and father had met Nate on six occasions. Jessica's mother testified that there was good interaction between Nate and Ava and that Nate was sensitive to the needs of Jessica, Cesar, and Ava. Although Jessica's mother had a close relationship with Ava and Cesar, she felt moving to Colorado to live with Nate would be tremendously beneficial for them. Jessica's father described Nate as a "great guy" and indicated that Nate's interactions with Cesar and Ava were extremely loving and close.

¶ 22    Nate testified that he was 38 years old and had been in the Air Force for 19 years. He was currently earning $65,000 per year. Nate was assigned to an Air Force base in Colorado as a space operator. He purchased a five-bedroom home close to the school his sons attended. Nate's Internet research indicated that the school district was above average in Colorado. Nate had volunteered for a one-year deployment and did not think he would be up for a transfer for at least two years. After two years, Nate would retire early to avoid a transfer out of Colorado. He could receive a minimum pension for retiring at 20 years and a maximum pension for retiring at 30 years of service. Nate could earn additional income on top of his pension benefits if he retired. Nate would earn approximately $80,000 doing a similar job in the private sector in Colorado. Nate did not know of any comparable private sector jobs that existed in Illinois. If Jessica was not granted leave to remove Ava from Illinois, Nate would most likely retire early and move to Illinois to be with Jessica.

¶ 23    Jeremy testified that Ava was close to both his and Jessica's parents and all of their extended family in Illinois. Jeremy testified that Ava was the most important thing in his life and his main focus. Jeremy requested full custody because he felt he had a more stable life than Jessica. Jeremy believed that Ava should be exposed to both parents on a frequent basis, as they were the people who loved her more than anything. He believed that Ava should know him as her dad and Jessica as her mother. As an alternative, Jeremy requested joint custody. He believed that he and Jessica could communicate about Ava's care and needs.

Jeremy would be devastated if Ava left the state because he would not be able to be a frequent part of her life or be involved in her school activities. Jeremy wanted Ava to grow up around his and Jessica's extended family in Illinois and know that she was loved and supported by family.

¶ 24 Jeremy believed that the travel back and forth to Colorado would be stressful on everyone. He also believed that being absent from Ava's life for extended periods of time at Ava's age would diminish their bond. Jeremy only had 15 days of vacation per year and 1 week off at Christmas. Jeremy believed that Jessica did not have structure in her life, did not put Ava first, could not communicate effectively, and became defensive when asked questions. Jeremy tried to communicate with Jessica via phone, but she would not respond. Jeremy admitted that through the spring of 2010 he took the breakup of his family and relationship with Jessica very hard but had since moved past that period of his life. Jeremy was not aware that he had the option of filing for temporary custody of Ava during the pendency of this case.

¶ 25 The trial court found that awarding joint custody to Jessica and Jeremy would not be in Ava's best interest because the parties could not resolve their issues in mediation and both parties wanted sole custody. The trial court found that there was a lot of friction between the parties to the point where they had to have other people witness their exchanges of Ava and could not deal with one another comfortably. The trial court found that Jeremy's reactions of threatening police involvement for Ava not being at day care and for Nate being on his property was "a little bit over the top." The trial court found that Jeremy's resentment about the breakup and his statements that he hated Jessica and thought she was a bad mother were indicative of not having enough respect for Jessica's child-rearing abilities in order to cooperate in joint parenting.

¶ 26 The trial court awarded sole custody of Ava to Jessica. The trial court found that Jeremy was still bitter toward Jessica, especially in light of his testimony that Jessica was a bad parent and was unstable. The trial court found Jessica to be more dispassionate than Jeremy and more willing and able to encourage and facilitate a relationship between Ava and Jeremy. The trial court also noted that Jessica had been Ava's primary caregiver. The trial court continued the case for a ruling on Jessica's petition for removal.

¶ 27 On April 5, 2011, a hearing took place on Jeremy's motion for the trial court to reconsider its denial of joint custody and award sole custody to Jessica, and for a ruling on the removal issue. The trial court found the parties did not have the ability to cooperate and denied Jeremy's motion to reconsider.

¶ 28 As for Jessica's removal petition, the trial court found that Jessica proved that her quality of life would be enhanced by the removal, which would enhance Ava's life. The trial court found that there was no showing of the schools being better in Colorado, but the removal would enhance Ava's life because Jessica and Nate would not have to maintain two separate households and Ava would benefit from Jessica being a stay-at-home mother. The trial court found that reasonable visitation could be established, with Jeremy having eight weeks of summer visitation with a week break for Jessica to visit Ava in Illinois, in addition to one week of visitation in September, November, December, February, and April. When Ava started kindergarten, the visits during February and September would cease, and Jeremy's

summer visitation would be shortened to seven weeks. Jeremy appealed.

¶ 29                                    ANALYSIS

¶ 30       On appeal, Jeremy argues that the trial court erred by: (1) denying joint custody; (2)
awarding Jessica sole custody; and (3) granting removal of Ava. The standard of review in
cases involving an appeal of a custody determination is whether the trial court abused its
discretion. In cases regarding custody, a strong presumption favors the result reached by the
trial court, and the trial court is vested with great discretion because of its superior
opportunity to observe and evaluate witnesses when determining the best interests of the
child. *In re Marriage of Seitzinger*, 333 Ill. App. 3d 103 (2002). Therefore, we will not
disturb a trial court's custody ruling unless it is against the manifest weight or is an abuse of
discretion. *Seitzinger*, 333 Ill. App. 3d 103. Similarly, we will not disturb a circuit court's
removal decision unless it is against the manifest weight of the evidence. *In re Marriage of
Eckert*, 119 Ill. 2d 316 (1988).

¶ 31                                 I. Joint Custody

¶ 32       On appeal, Jeremy first argues that the trial court erred in denying joint custody,
contending that he and Jessica have demonstrated their ability to cooperate in parenting Ava
under their informal arrangement.

¶ 33       Section 602.1 of the Act provides statutory guidelines for awarding joint custody. Section
602.1(b) states that the court shall consider joint custody on the motion of either or both
parents or upon the court's own motion, and may award joint custody if doing so would be
in the best interests of the child, taking into account the following:

     "(1) the ability of the parents to cooperate effectively and consistently in matters that
     directly affect the joint parenting of the child. 'Ability of the parents to cooperate' means
     the parents' capacity to substantially comply with a Joint Parenting Order. The court shall
     not consider the inability of the parents to cooperate effectively and consistently in
     matters that do not directly affect the joint parenting of the child;

     (2) [t]he residential circumstances of each parent; and

     (3) all other factors which may be relevant to the best interest of the child." 750 ILCS
     5/602.1(c) (West 2010).

Consequently, "the standards for an award of joint custody are the best interests of the child,
the agreement of the parents and their mutual ability to cooperate, the geographic distance
between parents, the desires of the child if he/she is of suitable age, and the relationships
previously established between child and parents." *Seitzinger*, 333 Ill. App. 3d at 108.

¶ 34       The language of the joint parenting statute defines the ability of the parents to cooperate
as "the parents' capacity to substantially comply with a Joint Parenting Order." 750 ILCS
5/602.1(c) (West 2010). A joint parenting order is an order specifying each parents' powers,
rights and responsibility for the personal care of the child and for major decisions such as
education, health care, and religious training. 750 ILCS 5/602.1(b) (West 2010). These
statutory prerequisites evidence an intent that joint custody only be awarded in circumstances

in which the parents are willing to cooperate in the children's upbringing. *In re Marriage of Drummond*, 156 Ill. App. 3d 672 (1987).

¶ 35    Awards of joint custody have been affirmed where each party desired to maintain maximum involvement with their child and the evidence demonstrated that the parties were able to cooperate. *In re Marriage of Hacker*, 239 Ill. App. 3d 658 (1992) (affirming joint custody where both parties were reasonably loving and capable parents who were sufficiently able to cooperate even though each party attempted to prove the other less capable); *In re Marriage of Marcello*, 247 Ill. App. 3d 304 (1993) (affirming a joint custody award over the mother's objection where father was actively involved in the child's activities, the mother testified the father should not be excluded from major decisions, and the parents live in close geographical proximity). On the other hand, awards of joint custody have been set aside on appeal where the evidence showed hostility and a lack of cooperation between the parties. See *Drummond*, 156 Ill. App. 3d 672 (reversing joint custody where there was no joint parenting agreement, mediation failed, evidence showed the parties lacked cooperation and were vindictive to each other, and the trial court failed to consider the geographic distance of the parties residing in Illinois and Texas); *In re Marriage of Bush*, 191 Ill. App. 3d 249 (1989) (reversing award of joint custody where the parties repeatedly exhibited hostility toward each other, sometimes resulting in physical confrontations).

¶ 36    In this case, the record shows that Jeremy cooperated with Jessica on major parenting issues that directly affected Ava, such as support, visitation, and where Ava would reside during the pendency of this case. The majority of Jessica and Jeremy's disagreements consisted of petty bickering that was not much different than any other parenting couple, whether married or unmarried. On this record, it could be said that the parents have demonstrated their ability to follow their own oral agreement such that they similarly would have the "capacity to substantially comply with a Joint Parenting Order" as required under the language of the joint parenting statute. See 750 ILCS 5/602.1(c)(1) (West 2010).

¶ 37    Nonetheless, the trial court did not abuse its discretion in denying joint custody. Here, the trial court found that awarding joint custody would not be in Ava's best interest because the parties did not have the necessary level of respect for each other to cooperate in Ava's child rearing, as indicated by their friction and need for third-party witnesses at their exchanges. Although Jeremy testified the parties were able to cooperate, Jessica contradicted Jeremy's testimony with evidence of animosity that had manifested into disparaging comments being said in front of Ava and Ava's day-care provider quitting to avoid being caught in the middle of the parties' conflict. We defer to the trial court's findings and, as such, cannot say that the trial court's denial of awarding joint custody was against the manifest weight of the evidence.

¶ 38                          II. Sole Custody Awarded to Jessica

¶ 39    Jeremy additionally argues that the trial court abused its discretion in awarding sole custody of Ava. We disagree.

¶ 40    In a custody dispute, the primary consideration is the best interest and welfare of the child. *Hall v. Hall*, 226 Ill. App. 3d 686 (1991). Regardless of whether the parents have ever

been married, when determining what custodial order serves the best interest of the child, the trial court shall consider all relevant factors, including the statutory factors listed under section 602(a) of the Act, which are: (1) the parents' wishes; (2) the minor's wishes; (3) the minor's interactions with parents, siblings, and others who may affect the minor's best interest; (4) the minor's adjustment to his home, school, and community; (5) the mental and physical health of all individuals involved; (6) physical violence, or threat thereof, by the minor's potential custodian, whether directed at the minor or another person; (7) the occurrence of ongoing or repeated abuse, whether directed at the minor or another person; (8) the willingness of each parent to facilitate a relationship between the minor and the other parent; and (9) whether one of the parents is a sex offender. *Hall*, 226 Ill. App. 3d 686; 750 ILCS 5/602(a) (West 2010).

¶ 41        In this case, the record supports the trial court's award of sole custody to Jessica. The court considered the evidence in its proper context and determined that most factors either favored neither party or were not applicable. The trial court properly focused on the factor of the willingness of each parent to facilitate a relationship between the minor and the other parent. The trial court found that Jessica would be more likely to encourage a close relationship between Ava and Jeremy in light of Jeremy's animosity toward Jessica and the disparaging comments he made about Jessica in front of Ava. The trial court additionally noted that Jessica had been Ava's primary caregiver since the parties' separation. *In re Marriage of Hefer*, 282 Ill. App. 3d 73 (1996) (although there is not a presumption in favor of the existing custodian when making an initial custody determination as there is in modification of custody cases, a court may consider the period of time a child has spent with a parent under a temporary custody order).

¶ 42        Essentially, the case was close, as indicated by the trial court, and the evidence did not strongly favor either party. Although the record could support a finding that Jeremy was more likely to encourage Jessica's relationship with Ava in light of his testimony stressing the importance of Ava's relationships with himself and Jessica as her parents and in light of Jessica's instructing Ava to call Nate "daddy," we must defer to the trial court's findings. As such, we affirm the trial court's decision to award Jessica sole custody.

¶ 43                                    III. Removal

¶ 44        Jeremy additionally argues that the trial court erred in granting Jessica's petition to remove Ava from Illinois to Colorado. We agree.

¶ 45        The burden of proving that removal is in the best interests of a child is on the party seeking the removal. 750 ILCS 5/609(a) (West 2010). Section 609(a) of the Act provides that the court may permit a custodial parent to remove a child from Illinois if such removal is in the best interest of the child. 750 ILCS 5/609(a) (West 2010). "A determination of the best interests of the child cannot be reduced to a simple bright-line test, but rather must be made on a case-by-case basis, depending, to a great extent, upon the circumstances of each case." *Eckert*, 119 Ill. 2d at 326.

¶ 46        When hearing the relevant evidence on the issue of removal, the court should consider: (1) whether the move would enhance the quality of life of the parent and the child; (2)

whether the custodial parent's motivation to move is intended to defeat or frustrate the noncustodial parent's visitation rights; (3) what motives the noncustodial parent has for challenging removal; (4) what visitation rights the noncustodial parent has; and (5) whether a realistic and reasonable visitation schedule can exist if the court allows the move. *Eckert*, 119 Ill. 2d 316. The factors enunciated in *Eckert* are not exclusive. *In re Marriage of Smith*, 172 Ill. 2d 312 (1996). The *Eckert* factors are to be considered and balanced when arriving at a best interest determination, and the weight given to each factor will vary according to the facts of each case. *Smith*, 172 Ill. 2d 312.

¶ 47        In this case, the trial court found that Jessica adequately proved that removal would enhance the quality of Ava's life because Jessica and Nate would not have to maintain the expenses of two households and Jessica would be a stay-at-home mother for Ava. A move that enhances a custodial parent's quality of life indirectly benefits a child's quality of life. *Eckert*, 199 Ill. 2d 316. However, in order to prove that removal is in a child's best interest, the custodial parent must prove more than his or her own desire to live with a new spouse. *Eckert*, 199 Ill. 2d 316. Here, the trial court's finding that Ava's quality of life would improve by having a stay-at-home mother was not supported by the evidence. Currently, Ava is only in day care twice a week with her paternal grandmother and has visitation with her father two to five days per week. There was no evidence presented that Ava having a stay-at-home mother was an improvement over her current situation of being able to see both of her parents on a regular basis and being in day care with her grandmother twice per week. Furthermore, under the removal schedule, Jeremy would have 13 full weeks with Ava but he only has 15 days of vacation time, meaning Ava would still be in daycare for at least 10 weeks of the year.

¶ 48        Additionally, removal to Colorado would have a drastic adverse effect on Jeremy and Ava's visitation. A child has an interest in maintaining significant contact with both parents following a divorce. *Eckert*, 119 Ill. 2d 316. When a parent has diligently exercised visitation rights, a court should be reluctant to interfere with those rights by allowing removal for unpersuasive or inadequate reasons. *Eckert*, 119 Ill. 2d 316. A reasonable visitation schedule is defined as one that will preserve and foster the child's relationship with the noncustodial parent. *Eckert*, 119 Ill. 2d 316. In this case, Jeremy has assiduously exercised his visitation with Ava, and removal would vastly reduce the frequency and quality of his visitation and involvement in Ava's life. Currently, Jeremy enjoys scheduled visitation with Ava on approximately 182 days with additional time around the holidays, which would be reduced to just 91 days if Ava were removed to Colorado. He currently enjoys 26 weekends with Ava, giving him 52 full days with her that he did not have to use vacation time, which would be reduced to 13 weekends or 26 full days. Also, given Ava's tender age, the present bond and relationship between Jeremy and Ava would be substantially altered if they had to wait two months or more between visits.

¶ 49        Moreover, at Ava's young age, the proposed schedule would deprive Ava of a stable home environment. Notably, the trial court awarded Jessica sole custody of Ava, finding that Jessica had been Ava's primary caregiver. Under the removal visitation schedule, Ava's primary caregiver, Jessica, would be absent from her life for eight weeks (with the exception of a week break) and five additional week-long periods throughout the year. Furthermore,

the burden of the frequent and time-consuming travel requirements to and from Colorado would fall upon a three-year-old. As proposed, Ava would be making six trips to Illinois per year, meaning that she would be required to take 12 flights per year if she were not burdened with a 15-hour car ride each way. The court's allowing Jeremy eight weeks with Ava in the summer and sporadic week-long visits throughout the year is not reasonable or realistic given the young age of Ava, the time and expense of the travel involved, Jeremy is only having 15 days of vacation, and the further diminishment of Jeremy's visitation once Ava starts kindergarten in two years.

¶ 50    Furthermore, the *Eckert* factors are not exclusive, and we must consider all the circumstances of this case. As such, we find it necessary to acknowledge that, although Jessica and Nate were married, they had yet to live in one household as husband and wife or as a family with Ava and their other children. The record shows that Jessica's marriage to Nate was her third serious relationship in six years, after having one child with her former husband and one child with Jeremy. Jessica married Nate after knowing him for 10 months and during the pendency of this case, prior to knowing if she would have custody of Ava or if removal would be approved. The evidence points to the indisputable conclusion that Jessica is somewhat impulsive. Based on the evidence presented, Jessica's argument that Ava's quality of life will be enhanced is little more than speculation at this point in time. See *In re Marriage of Berk*, 215 Ill. App. 3d 459 (1991) (providing that if the happiness that one spouse would receive from being able to live with a new spouse were sufficient to prove that removal was in the best interest of the child, the court supervision of the proceeding would be unnecessary and, at best, ceremonial).

¶ 51    In sum, given Ava's young age and the fact that a reasonable visitation schedule cannot be reached, the trial court's finding that Jessica met her burden of proving that it was in Ava's best interest to remove Ava from her father and extended family members in Illinois, with whom she is strongly bonded, in order to place her in Colorado with Nate and Jessica, who had yet to establish a marital home together, was against the manifest weight of the evidence. We reverse the trial court's order granting removal and remand for the trial court to reconsider the visitation schedule entered on May 23, 2011.

¶ 52                                      CONCLUSION
¶ 53    For the foregoing reasons, the decision of the circuit court of Peoria County is affirmed in part, reversed in part and remanded with directions.

¶ 54    Affirmed in part and reversed in part; cause remanded.