2018 IL App (2d) 170853
No. 2-17-0853
Opinion filed May 15, 2018

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| *In re* MARRIAGE OF GREG KAVCHAK, | ) | Appeal from the Circuit Court |
| | ) | of Du Page County. |
| Petitioner and Counterrespondent- | ) | |
| Appellant, | ) | |
| | ) | |
| and | ) | No. 16-D-97 |
| | ) | |
| ALICIA KAVCHAK, | ) | |
| | ) | Honorable |
| Respondent and Counterpetitioner- | ) | Timothy J. McJoynt, |
| Appellee. | ) | Judge, Presiding. |

PRESIDING JUSTICE HUDSON delivered the judgment of the court, with opinion.
Justices Schostok and Spence concurred in the judgment and opinion.

**OPINION**

¶ 1    Petitioner, Greg Kavchak, appeals from the judgment of the circuit court of Du Page County granting the motion of respondent, Alicia Kavchak, to relocate the parties' minor daughter, S.K., to North Carolina. On appeal, petitioner raises two principal issues. First, he contends that the trial court's relocation order is against the manifest weight of the evidence. Second, he argues that the trial court erred in *sua sponte* ordering that S.K. be enrolled in a private school in North Carolina. We affirm.

¶ 2                                    I. BACKGROUND

¶ 3    Petitioner and respondent married on August 26, 2006. S.K., the only child of the

marriage, was born on February 25, 2011. Petitioner filed a petition for dissolution of marriage on January 20, 2016. On February 16, 2016, respondent filed a response to petitioner's petition for dissolution of marriage and a counterpetition for dissolution of marriage. In both documents, respondent sought leave of court to relocate with S.K. to North Carolina. On July 25, 2016, respondent filed a notice of intent to relocate. The trial court declined to address the relocation issue in conjunction with the dissolution proceeding, finding that "relocation is another topic for another day."

¶ 4     On February 24, 2017, the trial court entered a judgment of dissolution of marriage and a parental-allocation judgment. The allocation judgment provided in relevant part that it was in S.K.'s best interests "for each party to be equally involved in significant decision-making for the minor child of the parties." As such, the allocation judgment required the parties to "consult with one another on significant issues prior to a decision being made" in the areas of education, health, religion, and extracurricular activities. In addition, the allocation judgment divided the parties' parenting time based on a two-week schedule. During the first week, petitioner's parenting time began on Wednesday at 5 p.m. and continued through Sunday at 5 p.m. During the second week, petitioner's parenting time began on Wednesday at 5 p.m. and continued through Friday at 5 p.m. The allocation judgment further provided that each party have three nonconsecutive weeks of parenting time during S.K.'s summer break, alternate parenting time on major holidays and S.K.'s birthday, and equal time during S.K.'s spring and winter breaks.

¶ 5     On March 3, 2017, respondent filed a motion for relocation, pursuant to section 609.2 of the Illinois Marriage and Dissolution of Marriage Act (Act) (750 ILCS 5/609.2 (West 2016)). In the motion, respondent requested permission to relocate with S.K. to North Carolina. Respondent's motion provided in relevant part as follows. Respondent left her job at the

University of Illinois at Chicago (UIC) and began working for High Point University in High Point, North Carolina, on June 1, 2016. Respondent's annual salary at High Point University is $87,000. Respondent currently works out of her home in Illinois, developing a curriculum, completing research activities, and working on a Ph.D. However, if respondent wants to keep her position at High Point University, she had to relocate to North Carolina by the fall of 2017. Respondent argued that the relocation is in S.K.'s best interests because (1) respondent's position in North Carolina would "enable [respondent] to be present when [S.K.] goes to school in the morning and when she comes home," (2) respondent's employer would pay for her to get her Ph.D., (3) S.K. would attend a "top-rated" private school, and (4) respondent's mother, Shirley Emerson, would join her and S.K. to assist in caring for S.K. On March 31, 2017, petitioner filed a response to the motion for relocation. On May 26, 2017, petitioner filed a petition to determine S.K.'s school enrollment. A hearing on respondent's motion for relocation and petitioner's petition to determine school enrollment began on June 27, 2017, and concluded on August 7, 2017. At that hearing, the parties agreed to incorporate the evidence from the dissolution proceeding. The evidence from the hearing established as follows.

¶ 6     Petitioner and respondent both grew up in Illinois. Petitioner's mother, Paula Kavchak, resides in Chicago. Petitioner's father and sister live in Florida. Emerson lives in Springfield. Respondent's father is deceased. Respondent has one sister, who resides in Ohio.

¶ 7     When the parties first married, they lived in Chicago. In January 2013, after S.K. was born, the parties moved into a 1700-square-foot, three-bedroom home with a yard, in downtown Downers Grove. The parties resided together in the marital home until March 2017, when respondent moved into an apartment in Woodridge. Respondent's apartment in Woodridge has two bedrooms and measures about 1000 square feet. Respondent signed a four-month lease for

the apartment. The lease was to expire on July 17, 2017, but has a month-to-month option. Petitioner remained in the marital home until June 2017, when it was sold. He then began renting a house in Downers Grove, six houses south of the marital home. Petitioner's rental house is 1600 square feet and has three bedrooms, two bathrooms, a basement, and a yard.

¶ 8     For the past 17 years, petitioner has been employed by Hendrickson International, a company that makes truck components. Petitioner works as a business analyst in the finance department. He earns $119,000 per year. His position is in Woodridge. Petitioner testified that, since S.K. was born, he has asked his employer at various times to modify his work schedule in light of his parenting obligations and his employer has always accommodated his requests. From when S.K. was 12 weeks old until August 2016, she attended KinderCare in Willowbrook. Petitioner took S.K. to KinderCare and picked her up most days. In August 2016, S.K. started kindergarten at Hillcrest Elementary School in Downers Grove.

¶ 9     Respondent is a physical therapist. She has a bachelor's degree in biology from Illinois Wesleyan University. In addition, she earned a master's degree in physical therapy in 2000 from the University of Indianapolis, a second master's degree in rehabilitation science in 2011 from UIC, and a doctorate in physical therapy in 2014 from Governors State University. Respondent is also a board-certified orthopedic specialist and a fellow of the American Academy of Orthopedic Manual Physical Therapists. From 2008 until May 19, 2016, respondent worked at UIC. Respondent classified her job title at UIC as a "specialist in physical therapy." Her primary function involved clinical work, but she also engaged in teaching and conducting research. Between 2013 and 2015, respondent's salary at UIC ranged between $85,000 and $86,137. Respondent testified that UIC waived the tuition for her master's degree in rehabilitation science and paid a portion of her tuition for her doctorate in physical therapy.

Respondent noted that UIC offers a tuition reimbursement program whereby it pays half of the tuition for an employee's child to attend one of eight state universities in Illinois.

¶ 10    Respondent's commute from Downers Grove to UIC was between 60 and 75 minutes, but her schedule was flexible. From the time in 2011 when she returned to work after S.K. was born until the family moved to Downers Grove in January 2013, respondent worked three 12-hour days per week plus one Saturday each month. From January 2013 through February 2015, respondent worked from 7 a.m. to 7 p.m. on Mondays and from 7:30 a.m. to 5 p.m. on Tuesdays, Wednesdays, and Thursdays. She was off on Fridays, but worked one Saturday per month. From February 2015 until May 2016, respondent's schedule was the same except that she worked until only 4 p.m. on Tuesdays, Wednesdays, and Thursdays.

¶ 11    In 2010, respondent worked at UIC with another physical therapist named Alexis Wright. During this time, Wright became respondent's "best friend." In 2011, Wright left UIC to take a job at High Point University. In or about July 2015, Wright and Dr. Eric Hegedus, the chair of High Point University's department of physical therapy, offered respondent a position as director of clinical education. Respondent turned down the position. A couple of weeks later, Wright and Hegedus contacted respondent again, offering her a position as an assistant professor. To maintain her employment with High Point University, respondent would have to obtain a Ph.D. High Point University agreed to pay for respondent to obtain a Ph.D. from the University of Otago in New Zealand. Respondent would do the research for her Ph.D. through a physical-therapy clinic run by High Point University.

¶ 12    Respondent first told petitioner about the job offer in July 2015. Respondent told petitioner that the position was her "dream job" and would allow her to pursue her Ph.D. According to respondent, petitioner was okay with her exploring the job and agreed to support

her. However, petitioner testified that he was opposed to respondent's taking the position and did not want to move to North Carolina. Respondent and petitioner had many discussions on the topic during July and August 2015. The couple discussed "creative solutions" to their differences. One of these solutions involved respondent renting an apartment in North Carolina and commuting back and forth to Illinois. Another solution involved respondent quitting her job and petitioner paying for respondent to obtain a Ph.D. in Illinois.

¶ 13   Respondent noted that UIC, Northern Illinois University (NIU), and Northwestern University have Ph.D. programs in Illinois. In November 2015, respondent and petitioner discussed respondent's obtaining a Ph.D. at NIU. Petitioner thought that the campus was too far from Downers Grove, so respondent never applied to the program. Respondent also testified that she would not be able to afford the Ph.D. programs at the Illinois universities and that none of them has advisors relative to her area of expertise. Respondent accepted the position at High Point University on November 9, 2015. The job had a start date of June 1, 2016, so respondent continued to work at UIC until May 19, 2016. Respondent acknowledged that she "loved" her job at UIC and quit the position only because of the opportunity at High Point University. Respondent explained that in 2010 and 2012 she had applied for two different assistant professor positions at UIC but was not hired for those jobs. In 2013 and 2014, respondent applied for teaching positions at Midwestern University in Downers Grove. Midwestern University was too far along in the interview process to consider her for the 2013 position and she was not offered the position she applied for in 2014. Respondent testified that the only job she applied for since getting her doctorate in physical therapy was the position at High Point University.

¶ 14   Respondent has had two one-year contracts with High Point University. The first contract ran from June 1, 2016, until May 31, 2017, with a salary of $87,000 per year. The

second contract runs from June 1, 2017, until May 31, 2018, with the same salary. Respondent testified that her position requires her to work 40 hours per week. Respondent's duties are "split between scholarship and publishing and doing research, sometimes administrative duties, clinical practice and teaching." Since High Point University's department of physical therapy is in the development stages and has yet to be accredited, no students were expected until May 2017. As a result, respondent had no teaching requirement until the fall 2017 semester. From her June 1, 2016, start date at High Point University until the relocation hearing, respondent worked remotely from Illinois for six to eight hours a day. Respondent was accepted at the University of Otago on May 30, 2017, and thus did not have to study for her Ph.D. up to that point. Respondent stated that High Point University's physical therapy clinic is "working with a very unique patient population," which will allow her to complete her Ph.D. research.

¶ 15    Regarding housing, respondent testified that she had looked at homes in Greensboro, Summerfield, and Stokesdale, North Carolina, which are about 20 minutes from High Point. She was looking for a four-bedroom home with at least 3000 square feet, at prices ranging from $250,000 to $550,000. Respondent testified that Emerson planned to move to North Carolina with her and S.K. According to respondent, Emerson would make a "substantial" down payment on the home and respondent would make the monthly mortgage payment. Respondent, Emerson, and S.K. would reside in the house together. Emerson corroborated respondent's testimony. Emerson stated that she would pay the real estate taxes, utilities, and insurance on the house and respondent would pay the mortgage. Emerson testified that she would not move to the Chicago area if relocation were denied. She also acknowledged that, but for respondent's desire to move to North Carolina, she would not move there.

¶ 16    At the relocation hearing, petitioner described his relationship with S.K. as "very strong."

He stated that he is an "active father" and a "day-to-day dad." Petitioner testified that he cared for S.K. on a daily basis for the first six years of her life. Petitioner likes to do homework with S.K., go to her extracurricular activities, and watch her grow. Petitioner described his week-to-week parenting time with S.K. In addition, since respondent moved out of the marital home in March 2017, he has had telephonic contact with S.K. through FaceTime about once a day. Petitioner testified that S.K. dictates how long the calls are, but they generally last between 20 seconds and 7 minutes.

¶ 17 Petitioner explained that, when respondent moved out of the marital home in March 2017, he changed his work schedule to "take advantage of [his] parenting time [and] to keep the quality of care that [he has] been giving [S.K.] since she was born." Specifically, petitioner altered his work schedule to ensure that he is off work on Wednesdays at 4:30 p.m. so he can be home by 5 p.m., when respondent drops off S.K. In addition, on Thursday and Friday mornings, he starts work at 8:30 a.m. so that he can spend those mornings with S.K. before school and walk her to the school bus. Paula Kavchak resides in Chicago and is able to stay with S.K. on Thursday afternoons until petitioner arrives home at 5:30 p.m. On Friday afternoons, petitioner leaves work by 3 p.m. so that he can be available for S.K. when she gets home from school.

¶ 18 S.K. takes swimming lessons and violin lessons. Respondent found both programs. S.K.'s swimming lessons began in 2014. The swimming lessons occur once a week, on Fridays at 5 p.m. Petitioner transports S.K. to each lesson and stays for the entire lesson. Respondent also attends S.K.'s swimming lessons. S.K. has been taking violin lessons since October 2016. Violin lessons occur once a week and take place at respondent's apartment. Respondent has not invited petitioner to attend the lessons, because they occur when he is normally at work. Petitioner, however, attended S.K.'s violin recital.

¶ 19   Petitioner testified that, since the entry of the judgment of dissolution, he has exercised all of the parenting time allocated to him. Petitioner testified that, other than when his mother watches S.K. after school on Thursday afternoons, he has never left S.K. with a babysitter during his parenting time. Petitioner admitted, however, that on weekdays during S.K.'s summer break, she went to KinderCare. This is the same KinderCare location S.K. attended from when she was 12 weeks old until she started kindergarten in August 2016. According to petitioner, S.K. enjoys KinderCare, even requested it, and sometimes wants to stay longer when he comes to pick her up.

¶ 20   Petitioner testified that, since the parties implemented the parenting-time schedule set forth in the allocation judgment, his activities with S.K. during the school week have included doing homework, getting her ready for school, cooking for her, taking her to and picking her up from the bus stop, and watching movies. During petitioner's parenting time, S.K. talks to respondent via FaceTime. Petitioner also testified that he and S.K. have a bedtime routine. At about 7:45 p.m., S.K. takes a shower. They then read books and talk for a few minutes. Petitioner then takes S.K. to her room and sings to her. Petitioner then turns out the lights and checks on her about 10 minutes later. On weekends, petitioner and S.K. enjoy going to parks, children's workshops at Home Depot, movies, and the Museum of Science and Industry. They also like to get donuts, go to the library, arrange play dates, go strawberry and blueberry picking, and eat out. In addition, petitioner taught S.K. how to ride a bike. Petitioner testified that, since he and respondent began implementing the parenting-time schedule, the time he spends with S.K. is "the best quality time [he has] had with [S.K.] in well over a year." Petitioner added that S.K.'s demeanor with him is a lot more "cuddly" and she is more "affectionate." He stated that S.K. "seems happier than [he] remember[s]."

¶ 21    Petitioner testified that he objects to respondent's moving to North Carolina with S.K. He explained that he is the only male influence that S.K. has in her life and that S.K. "would miss the day-to-day interactions that [he has] with her." Petitioner also stated that S.K. had just gone through a "tough transition from having both parents around to not having both parents in the same house." Petitioner is also concerned that he is going to miss spending quality time with S.K. such as by getting her ready for school, cooking her meals, taking her places, helping with her homework, and watching her grow. Petitioner stated that he and S.K. have done all of these things together for the first six years of her life but that, if relocation is permitted, it will no longer be possible.

¶ 22    Petitioner opined that the "culture" in North Carolina is not as good as it is in the Chicago area. He explained that in the Chicago area he and S.K. have gone to various parks, museums, zoos, amusement parks, restaurants, movie theaters, and miniature golf courses. Petitioner is concerned that there are not as many activities in or around High Point as there are in the Chicago area. He also opined that there are "significantly more and higher quality" cultural institutions in the Chicago area. Petitioner researched the school systems in High Point and Greensboro and the school system in Downers Grove, using the website "gradeschools.com," and his research revealed that the schools in Downers Grove were "well above" those in High Point and Greensboro. He also observed that "half of [S.K.'s] family, her immediate family is [in Illinois]." Moreover, petitioner examined 2016 crime statistics for Downers Grove and Greensboro/High Point on a website called "citydata" and his research revealed that the North Carolina towns had higher crime rates.

¶ 23    Petitioner further expressed that the quality of his time with S.K. "will be extremely less than it is now." He explained that he and S.K. will not be able to enjoy the day-to-day activities

they do together now. In addition to the quality of time he spends with S.K., petitioner is concerned that the quantity of time will be reduced. Under the parties' current parenting schedule, S.K. spends 6 out of every 14 days nights with petitioner. In addition, S.K. spends three nonconsecutive weeks with petitioner during the summer, one-half of her winter and spring breaks, and alternating holidays.

¶ 24    Petitioner's concern is that even a larger block of uninterrupted parenting time during the summer is not a substitute for more time during the week, when he can be a "day-to-day dad" and do all the day-to-day functions with her that he has been doing her whole life. Petitioner pointed out that, if he were awarded a larger block of time during the summer, S.K. would have to attend daycare for most of that time. Petitioner also testified that, if S.K. were living primarily with respondent in North Carolina, the friendships she developed at school "would not be transferable to [Illinois] over the summer" when she would be with him, and she would not be able to participate in any of the extracurricular activities she enrolled in.

¶ 25    Petitioner also believes that having a six-year-old child get on a plane every month from North Carolina to Chicago is "a little bit much." Respondent agreed that this would require S.K. to travel to the airport after she leaves school on Friday afternoon, arrive at the airport early enough to make the flight, take a flight lasting 90 to 120 minutes to Chicago, and then ride from the airport to petitioner's residence. This would mean that S.K. would arrive in Downers Grove on Friday night. S.K. would then have to leave petitioner's home sufficiently early on Sunday to go to bed early enough to wake up for school on Monday. Petitioner also expressed concern that much of his parenting time on weekends in North Carolina would be spent traveling. Petitioner testified that he would fly out of Midway Airport, which, depending on traffic, is between 45 and 60 minutes from Downers Grove. He would arrive at the airport 60 to 90 minutes prior to

departure. The flight to Greensboro is about two hours. This amounts to between 4 and 4½ hours, not including time to collect his bags, rent a car, and drive to wherever S.K. is staying.

¶ 26 Respondent testified that the plane tickets she has purchased to travel between Chicago and North Carolina have been around $500. However, respondent testified that she has purchased tickets only "on the short term" and into Raleigh, North Carolina, which is about 60 or 70 miles from Greensboro. Respondent testified that either she or Emerson would travel with S.K. to Illinois, at respondent's cost. Respondent did not know how much lodging would cost petitioner in Greensboro. Respondent testified, however, that she and Emerson plan to buy a four-bedroom home in North Carolina. Respondent offered to allow petitioner to stay in the extra bedroom during his parenting time with S.K. in North Carolina. Respondent testified that she made the offer because she agreed that it would "feel weird having to be in a hotel" during petitioner's parenting time with S.K. Petitioner testified, however, that he would not be comfortable staying in respondent's home during his parenting time.

¶ 27 Respondent testified that, if relocation to North Carolina were permitted, she would not use daycare, because Emerson can pick up S.K. from school if respondent is unavailable. Respondent added that, although she is expected to work a 40-hour workweek at High Point University, she has to be on campus for only five hours a day. Hegedus noted that, while "the wording in [the] contract says, five hours a day on campus," "[w]ithin that five hours is considered your office hours. And most people stay much longer than that, of course." Hegedus added that respondent will be required to participate in other activities on and off campus, possibly on the weekends. Respondent testified that if she remained in Illinois she "would assume" that S.K. would have to go to daycare. She explained that, because there are no academic positions available in the Chicago area, she would be "forced to go back to being a

clinician," with hours in the early morning, late at night, and on weekends to accommodate patients who work. As a result, respondent would have to work one or two evenings or early mornings each week and on weekends.

¶ 28    Respondent testified that she has researched public elementary schools in North Carolina online, spoken with faculty at High Point University about where they enrolled their children, talked to one individual in the education department at High Point University, and looked at several private schools. Ultimately, respondent settled on Westchester Country Day School (Westchester). The tuition at Westchester is $12,000 per academic year. Respondent described Westchester as a "good fit" for S.K. Respondent liked Westchester because its average class size is only 18 to 20 students. She also stated that the school has "a really nice sense of community," its academic standards are high, and it provides individualized teaching. In addition, Westchester offers the opportunity to learn Mandarin in the second grade and Spanish in the fourth or fifth grade. Respondent testified that the class size at Hillcrest Elementary is about 24 students. She also noted that "basic" Spanish is taught at Hillcrest Elementary, but Mandarin is not. Respondent further testified that 100% of Westchester's students go to college and their SAT scores are similar to those at Downers Grove North High School.

¶ 29    Respondent testified that she told petitioner about Westchester, informed him when admission testing would occur, and encouraged him to talk to representatives of the school. According to respondent, however, petitioner did not contact anyone at the school. In March 2017, respondent took S.K. for testing at Westchester. Respondent eventually registered S.K. to attend Westchester. Respondent testified that she "had to enroll her, or [S.K.] was going to lose the spot [she] had reserved." Respondent testified that she would not ask petitioner to contribute to the tuition at Westchester if she were permitted to relocate. Petitioner acknowledged that

respondent told him about Westchester. Petitioner testified that he objected to respondent's taking S.K. to North Carolina to be tested at Westchester and never agreed to enroll S.K. at Westchester but that he did not "object" to Westchester. Petitioner testified that he is concerned because of the size of the school. Specifically, he stated that the class sizes at Westchester are "very small" and he would prefer that S.K. go to a bigger school.

¶ 30    At the relocation hearing, both parties presented the testimony of their respective expert witnesses. Respondent's witness was Dr. Robert Shapiro. Petitioner's witness was Dr. Mark Goldstein.

¶ 31    Shapiro is a licensed clinical psychologist specializing in forensic psychology and clinical psychology. In preparation for the evaluation, Shapiro met with both petitioner and respondent individually for six hours each and with S.K. individually for four hours. Shapiro also observed S.K. with each parent. In addition, Shapiro reviewed various documents and met with a number of "outside people," including S.K.'s former guardian *ad litem*, S.K.'s kindergarten teacher, the parties' mothers, Hegedus, and Wright. Shapiro wrote a 16-page report of his evaluation, which was admitted into evidence.

¶ 32    Shapiro found that both parties were "pretty straight" with him and that both parties were good parents. Shapiro described petitioner's interactions with S.K. as loving, gentle, invested, and involved. In turn, S.K. was responsive, happy to be with petitioner, playful, and interactive. Shapiro testified that it was clear that petitioner and S.K. have a "nice attachment and a positive bond." With respect to respondent's interactions with S.K., Shapiro testified that all of the things he said about petitioner "would equally apply" to respondent, although he characterized respondent's interactions as "a little bit more intimate," with "a lot more physical contact." Shapiro found that respondent's relationship with S.K. demonstrated "a very positive attachment

between daughter and mother." Based on his observations, Shapiro described petitioner's parenting style as "a little bit more strict, a little bit more rigid, where [respondent] is more nurturing, is able to do—is able to get [S.K.] to do things through persuasion more rather than direction."

¶ 33    In his report, Shapiro referenced research by Jonathan Gould and David Martindale suggesting that a move of more than 75 miles compromises the quality of a parent-child relationship with the parent who is left behind. Such a move "disrupts the weekly contact and the various activities that take place on a weekly basis such as regularly participating in extracurricular activities and schoolwork" and "relegates the parent to the role of a visiting parent rather than a participating parent." Shapiro agreed with Gould's and Martindale's research, commenting that "[t]here is no doubt about the disruptive capability of an out-of-state move as proposed by [respondent]." Nevertheless, Shapiro found respondent's position equally compelling. For instance, Shapiro observed respondent's longstanding desire to obtain a Ph.D. in her profession and subsequently use that degree to teach at a university, to conduct research, and to practice clinically. Petitioner knew since before the parties' marriage that respondent was interested in obtaining a Ph.D. Respondent attempted to find programs in the Chicago area, but she could not find anything comparable to what High Point University offered her. Further, Hegedus told Shapiro that respondent has a "unique opportunity where she is actually being paid to work and get her PhD." Hegedus opined that, if respondent loses this opportunity, her career path "will be permanently damaged."

¶ 34    Ultimately, Shapiro opined that relocation is appropriate in this case, although he acknowledged that it was a "very difficult decision." In support of his decision, Shapiro initially noted that, regardless whether relocation is allowed, S.K. will be faced with "a different school

district and altered parenting," because the marital home was being sold. Shapiro further noted that, if relocation is denied, respondent will need to find a local job and S.K. "undoubtedly will spend time in daycare." If relocation is allowed and respondent keeps her position at High Point University, "daycare will not be necessary and [S.K.] will spend the same quality of time with her mother that she currently enjoys." Shapiro found that respondent's desire for relocation is "genuine and sincere" and that petitioner's objection to relocation was for no reason other than S.K.'s best interests. Shapiro concluded that the move "would likely enhance [S.K.'s] quality of life by allowing [respondent] to spend far more quality time with [S.K.] then [*sic*] would be the case if she were required to stay in Illinois." Shapiro described respondent's opportunity at High Point University as "clearly unique in that she is being paid to pursue her Ph.D. and also allowed time during her workweek to pursue her Ph.D." Shapiro also noted that High Point University is covering the cost of respondent's Ph.D. Shapiro acknowledged that relocation will "compromise" the nature and quality of petitioner's relationship with S.K. He observed, however, that relocation will not eliminate the relationship. Shapiro was convinced that respondent will do everything necessary to support and maintain S.K.'s relationship with petitioner. Shapiro opined that the father-daughter relationship can be maintained with a "certain structure of parenting time even though it will not necessarily allow for the same level of involvement [petitioner] currently enjoys."

¶ 35    On cross-examination, Shapiro acknowledged that relocation will be disruptive as it relates to petitioner and S.K. When asked whether, if relocation were allowed, petitioner would be relegated to the role of a "visiting parent" as opposed to a "participating parent," Shapiro responded that it depends on petitioner's investment of time on matters related to S.K., such as by contacting schools or making himself available to teachers. Shapiro acknowledged, however,

that the proposed arrangements for petitioner to travel to North Carolina and stay in a hotel to exercise parenting time "have all the markings of a visiting parent."

¶ 36 Shapiro stated that one of the reasons he found that relocation would be appropriate was respondent's ability to obtain a Ph.D. at no cost. Shapiro stated that he did not know respondent's income at UIC or at High Point University. Nevertheless, he indicated that access to a greater income played a role in his conclusion, because he "just know[s] that [respondent] would be making more money working less hours with a PhD." When asked how he knows this, Shapiro responded, "Good question. I don't have those figures, but a PhD would demand more money than someone that has a master's degree."

¶ 37 Shapiro testified that, if respondent stayed in Illinois, she would need to get a job as a physical therapy clinician. This would involve working some weekday evenings and some weekend time and would require S.K. to be in daycare. Shapiro nevertheless agreed that it was possible that, with petitioner having 6 of 14 overnights with S.K. under the current parenting-time schedule, respondent could schedule her evenings or weekends during petitioner's parenting time.

¶ 38 Shapiro agreed that S.K. has a good connection with her school and community in Illinois. She has friends in Illinois, and she likes her school in Illinois. Shapiro did not find anything to indicate that the educational opportunities for S.K. are greater in North Carolina than they are in her current school district. He also agreed that the benefit of reduced college tuition would be available at a school other than High Point University if respondent were a faculty member at the institution.

¶ 39 Goldstein is a licensed clinical psychologist and a forensic psychologist. In conducting his evaluation, Goldstein met with petitioner, respondent, and S.K. He also conducted collateral

interviews with other individuals, observed S.K. interact with each of her parents, and reviewed documents provided by the parties. In addition, Goldstein had petitioner and respondent complete "some parenting inventories" and he administered the Bricklin Perpetual Scales Inventory to S.K. Goldstein authored a 28-page report of his evaluation, which was admitted into evidence.

¶ 40 Goldstein testified that the parenting inventories did not indicate any significant parenting problems with either parent. In addition, S.K.'s score on the Bricklin Perpetual Scales Inventory indicated that she perceives her parents "pretty equally." Goldstein testified that the results of the test were consistent with his own observations of S.K. when he met her with each parent. According to Goldstein, S.K. had a "great interaction" with each parent.

¶ 41 Goldstein testified that he did not see anything during his evaluation that indicated that S.K. would receive a direct benefit by relocating to North Carolina with respondent. For instance, based on his research and the information that respondent provided, Goldstein had no reason to believe that the educational opportunities for S.K. would be greater in North Carolina than they are in Du Page County. He observed that S.K. had established relationships with individuals in her current community and school and that she was well adjusted to her school. Goldstein also noted that S.K. has a good relationship with her grandmothers, both of whom reside in Illinois, and she does not currently have any extended family in North Carolina. In addition, Goldstein considered the distance between Illinois and North Carolina.

¶ 42 Goldstein testified that respondent told him that the homes in North Carolina are more affordable, so she could afford a nicer home in a nicer community. Goldstein testified, however, that he does not think that the opportunity for a larger home would provide any significant benefit to S.K. Goldstein stated that either parent could provide a sufficient home for S.K. in

Illinois.

¶ 43    Goldstein reviewed Shapiro's report and stated that he is familiar with the research of Gould and Martindale.  He agreed with their finding that a move of more than 75 miles compromises the quality of the relationship between the child and the parent who is left behind.  Thus, Goldstein also agreed that, in this case, the proposed move would compromise the quality of the relationship between S.K. and petitioner.  He stated that he agreed "to some degree" with research indicating that the parent who is left behind is relegated to being a "visitor" as opposed to a "participating parent."  Goldstein testified that, given the distance, it would be "extremely difficult" for the trial court to fashion an alternate arrangement that would protect and preserve the relationship between S.K. and petitioner.

¶ 44    Goldstein had no doubt that the proposed relocation would disrupt the relationship between S.K. and petitioner.  Goldstein explained that a parent's communication with a child via FaceTime is qualitatively different from in-person contact.  He added that a parent's need to travel to another community interferes somewhat with the quality of the relationship, because the interaction is not taking place at the child's home.  Moreover, the child cannot benefit from the parent's participation in school or extracurricular activities.

¶ 45    Ultimately, Goldstein opined to a reasonable degree of psychological certainty that relocation to North Carolina is not in S.K.'s best interests, although he acknowledged that the issue is "relatively close."  Goldstein did not observe anything during the course of his evaluation that indicated that petitioner's objection to relocation was for any reason other than S.K.'s best interests.  In addition, Goldstein believes that respondent's motivation for relocating to North Carolina is sincere.  On cross-examination, Goldstein acknowledged that a one-time relocation with a younger child is much less destructive than multiple moves, and he cited

research suggesting that relocation should not be denied just because some harm might occur.

¶ 46    At a hearing on August 9, 2017, the trial court issued an oral decision. The court discussed the factors set forth in section 609.2(g) of the Act (750 ILCS 5/609.2(g) (West 2016)) to consider in assessing a parent's request for relocation. The court also considered the 17 best-interest factors set forth in section 602.7 of the Act (750 ILCS 5/602.7 (West 2016)). With respect to each of the section 609.2(g) factors, the court found as follows.

¶ 47    The first factor under section 609.2(g) (750 ILCS 5/609.2(g)(1) (West 2016)) is "the circumstances and reasons for the intended relocation." The court found that respondent had no bad intent, noting that the position at High Point University was her "dream job" and that respondent quit her job at UIC and "took a risk *** hop[ing that she and petitioner] were going to work it out." The second factor (750 ILCS 5/609.2(g)(2) (West 2016)) involves "the reasons, if any, why a parent is objecting to the intended relocation." Regarding that factor, the court stated that it heard "virtually no evidence of bad intent on behalf of [petitioner] in resisting the relocation" and that respondent "was thinking of the child and his relationship with the child."

¶ 48    The third factor under section 609.2(g) (750 ILCS 5/609.2(g)(3) (West 2016)) addresses "the history and quality of each parent's relationship with the child and specifically whether a parent has substantially failed or refused to exercise the parental responsibilities allocated to him or her under the parenting plan or allocation judgment." The court stated that this factor "favor[s] both sides probably equally." The court found that the history and quality of each parent's relationship with S.K. are "clearly quite strong." The court also found that both parents had exercised all of their parenting time with S.K.

¶ 49    The fourth factor under section 609.2(g) (750 ILCS 5/609.2(g)(4) (West 2016)) is "the educational opportunities for the child at the existing location and at the proposed new location."

The court found that Hillcrest Elementary was "an exceptional school." The court also found that Westchester "appears to be a good school, a school that apparently sends 100 percent of their graduates to college and has an extensive foreign language program." Further, the court observed that both of the parties' experts found the two schools to be comparable. The court stated that S.K. is "bright and will be successful in any school setting *** with either of these parents." Finally, the court remarked that respondent would be paying the tuition at the North Carolina school, "which apparently she can now do with her—if she's allowed to relocate because she's going to be making, I guess, [$]96,000 a year. That's a factor the court has to consider, too."

¶ 50 The fifth factor under section 609.2(g) (750 ILCS 5/609.2(g)(5) (West 2016)) concerns "the presence or absence of extended family at the existing location and at the proposed new location." With respect to this factor, the trial court observed that both grandmothers reside in Illinois and neither party has family in North Carolina. The court noted, however, that Emerson indicated that she would move to North Carolina with respondent and S.K. if relocation were allowed. Ultimately, the court characterized this factor as "evenly divided."

¶ 51 The sixth factor under section 609.2(g) (750 ILCS 5/609.2(g)(6) (West 2016)) involves "the anticipated impact of the relocation on the child." Relying on *In re Marriage of Collingbourne*, 204 Ill. 2d 498 (2003), the court stated that it would consider both direct and indirect benefits to S.K. under this factor. The court first found that respondent's $96,000 salary at High Point University constituted an increase that, although "[n]ot great," was still an indirect benefit to S.K. The court commented that respondent's hours at the new job and the shorter commute would result in S.K. spending less time in daycare and respondent having more quality time with S.K. The court also noted that S.K. will be able to attend college for free, respondent

will have "health insurance and benefits" for herself and S.K., and respondent will be able to obtain a Ph.D. for free. Regarding housing, the court observed that respondent planned to buy a home with the help of her mother. The court noted that, according to respondent, she could buy a bigger house in North Carolina for less money and with more yard space. Petitioner argued that respondent's testimony regarding housing was "rank speculation," and the court remarked that petitioner was "probably right."

¶ 52 The court observed that, although petitioner was critical of the culture and the schools in North Carolina, his testimony was "without much particularity." The court explained, for instance, that, although petitioner testified that Westchester was too small, he failed to indicate what was wrong with that. The court also pointed out that, although petitioner obtained information regarding the crime rates in some communities in North Carolina, he offered no comparisons. The court acknowledged that if S.K. remains in Illinois she will attend a good school. She will go to daycare at KinderCare, a facility she knows well. Furthermore, S.K. will continue with her extracurricular activities, be able to see her friends, and have her father around.

¶ 53 The seventh factor under section 609.2(g) (750 ILCS 5/609.2(g)(7) (West 2016)) addresses "whether the court will be able to fashion a reasonable allocation of parental responsibilities between all parents if the relocation occurs." As to this factor, the trial court stated that there was evidence of many direct flights between Chicago and Greensboro or Raleigh. The trial court noted that respondent offered to fly S.K. along with a chaperone to Chicago once a month at her expense and further proposed that petitioner travel to North Carolina once a month to have additional parenting time in the summer. The trial court acknowledged petitioner's concerns that respondent's proposal would involve a lot of traveling time and that the parenting time would be "difficult" and "not much quality" after all the

traveling. The court, noting that petitioner had been able to adjust his work schedule in the past, suggested that petitioner could possibly leave work earlier on Fridays or use some vacation time from work to travel on Thursdays or Friday mornings. The court stated that the number of days of parenting time "maybe wouldn't change," but it added that this "is not a numbers game." The court stated that the quality of petitioner's parenting time with S.K. is the most important thing.

¶ 54    The eighth factor under section 609.2(g) (750 ILCS 5/609/2(g)(8) (West 2016)) concerns "the wishes of the child, taking into account the child's maturity and ability to express reasoned and independent preferences as to relocation." The court found that S.K.'s wishes as to relocation were not probative, primarily because of her age.

¶ 55    The ninth factor under section 609.2(g) (750 ILCS 5/609.2(g)(9) (West 2016)) is "possible arrangements for the exercise of parental responsibilities appropriate to the parents' resources and circumstances and the developmental level of the child." In addressing this factor, the court noted that, if respondent is not allowed to relocate, she will lose her job at High Point University. The court found, in turn, that the loss of respondent's job "has an affect [*sic*] on her economic situation." The court also found that, although the parties expended "[m]uch trial time" on this topic, there was no proof that respondent had a similar employment opportunity in Illinois.

¶ 56    The tenth factor under section 609.2(g) (750 ILCS 5/609.2(g)(10) (West 2016)) addresses "minimization of the impairment to a parent-child relationship caused by a parent's relocation." The court categorized this factor as "the factor in this case" and "the most difficult factor." The court agreed with both Shapiro and Goldstein that relocation will negatively affect petitioner's relationship with S.K. to some extent. The court noted Goldstein's admission that a one-time relocation with a younger child is much less destructive than multiple moves and that relocation

should not be denied just because some harm might occur. The court observed that petitioner wants to keep his frequent, almost daily, contact with S.K. The court noted, however, that even with "a very liberal parenting schedule," petitioner "may fall short of six out of fourteen days, which is what he has now." If relocation is permitted, respondent has offered petitioner parenting time of alternating weekends, extended time in the summer, and holidays. She also discussed FaceTime and Skype opportunities. The court stated that the "bottom line" was whether petitioner's relationship with S.K. can "survive and prosper" with less frequency.

¶ 57   In ruling, the court remarked that both experts described this case as a "close call." The court agreed that "this is a close case," adding that "there is no right answer." The court found "[t]he key" to be S.K.'s best interests. The court noted that Shapiro's report listed the benefits to S.K. if relocation is permitted. The court observed that these benefits included "daycare and college and benefits and housing." The court stated that it ascertained from Shapiro's list that S.K. will benefit both directly and indirectly if relocation is permitted. As a result, the court granted respondent's petition to relocate. The court also modified the parental-allocation judgment, ordered respondent to "enroll the child in the North Carolina private school as soon as possible," and required respondent to be solely responsible for the cost of S.K.'s tuition at the private school.

¶ 58   On August 16, 2017, the trial court entered a written order modifying the parental-allocation judgment. That order provides in relevant part as follows. Petitioner was granted parenting time with S.K. on alternating weekends, with the first weekend to occur in Illinois and the second weekend to occur in North Carolina. Parenting time would last from Friday to Sunday, but it could be extended on longer weekends. The parties could agree to additional parenting time between petitioner and S.K., and petitioner would be allowed additional weekend

visitation anytime in North Carolina from Friday after school until Sunday evening with at least 60 days' notice. Petitioner was also awarded five weeks of parenting time in the summer, broken up into one period of three consecutive weeks and a second period of two consecutive weeks. Petitioner was allocated all of spring break in even years and half of spring break in odd years. Winter break, including Christmas and New Year's Day, was allocated so that one year petitioner's parenting time would run from the Saturday after school is out until December 26, and the next year his parenting time would run from December 26 until the Sunday before school starts. The court eliminated petitioner's parenting time on his birthday and Halloween and ruled that each parent have one telephone or Skype contact per day. Respondent was responsible for all costs relating to S.K.'s travel to Illinois for parenting time with petitioner, while petitioner was responsible for traveling costs associated with his parenting time in North Carolina. The court also denied petitioner's petition to determine school enrollment and provided that the order was final and appealable.

¶ 59    On August 29, 2017, petitioner filed a motion to reconsider. On September 22, 2017, respondent filed a response to the motion to reconsider. On October 18, 2017, petitioner filed a motion for leave to supplement his motion to reconsider with *In re Parentage of P.D.*, 2017 IL App (2d) 170355, an opinion issued by this court on October 13, 2017. On October 19, 2017, the trial court denied petitioner's motion to reconsider. On October 23, 2017, petitioner filed a notice of appeal.

¶ 60                                   II. ANALYSIS

¶ 61    On appeal, petitioner raises two issues. First, he argues that the relocation order is against the manifest weight of the evidence. Second, he argues that the trial court erred in *sua sponte* ordering that S.K. be enrolled at Westchester. We address each contention in turn.

¶ 62                              A. Relocation Order

¶ 63    Prior to 2016, section 609 of the Act (750 ILCS 5/609 (West 2014)) governed the "removal" (now relocation) of a child from Illinois. Section 609 provided that a court may grant leave to remove a child "whenever such approval is in the best interests of such child or children." 750 ILCS 5/609 (West 2014); see *P.D.*, 2017 IL App (2d) 170355, ¶ 15. Although section 609 was silent regarding the factors a trial court should consider in making this best-interest determination, the supreme court developed various factors through case law. See *Collingbourne*, 204 Ill. 2d at 522-23; *In re Marriage of Smith*, 172 Ill. 2d 312, 320-21 (1996); *In re Marriage of Eckert*, 119 Ill. 2d 316, 326-28 (1988). These factors, referred to as the *Eckert* factors, include (1) the likelihood that the proposed move will enhance the general quality of life for both the custodial parent and the child; (2) the custodial parent's motives for seeking removal, to determine whether the proposed move is a ruse designed to frustrate or defeat the noncustodial parent's visitation; (3) the noncustodial parent's motives in resisting removal; (4) the effect removal will have on the noncustodial parent's visitation rights, because it is in the best interests of a child to have a healthy and close relationship with both parents, as well as with other family members; and (5) whether a reasonable visitation schedule can be worked out. *P.D.*, 2017 IL App (2d) 170355, ¶ 16 (citing *Collingbourne*, 204 Ill. 2d at 522-23, citing *Eckert*, 119 Ill. 2d at 326-27). The supreme court has stated that the *Eckert* factors are to be considered and balanced by the trial court and that no one factor is controlling. *Collingbourne*, 204 Ill. 2d at 523.

¶ 64    Effective January 1, 2016, the General Assembly repealed section 609 of the Act and replaced it with section 609.2. See Pub. Act 99-90, § 5-20 (eff. Jan. 1, 2016) (repealing 750 ILCS 5/609); Pub. Act 99-90, § 5-15 (eff. Jan. 1, 2016) (adding 750 ILCS 5/609.2). Section

609.2 codifies the factors a court must consider when ruling on a petition for relocation. Pursuant to section 609.2, the trial court must decide whether relocation is appropriate, based upon the best interests of the child in light of the following 11 factors:

"(1) the circumstances and reasons for the intended relocation;

(2) the reasons, if any, why a parent is objecting to the intended relocation;

(3) the history and quality of each parent's relationship with the child and specifically whether a parent has substantially failed or refused to exercise the parental responsibilities allocated to him or her under the parenting plan or allocation judgment;

(4) the educational opportunities for the child at the existing location and at the proposed new location;

(5) the presence or absence of extended family at the existing location and at the proposed new location;

(6) the anticipated impact of the relocation on the child;

(7) whether the court will be able to fashion a reasonable allocation of parental responsibilities between all parents if the relocation occurs;

(8) the wishes of the child, taking into account the child's maturity and ability to express reasoned and independent preferences as to relocation;

(9) possible arrangements for the exercise of parental responsibilities appropriate to the parents' resources and circumstances and the developmental level of the child;

(10) minimization of the impairment to a parent-child relationship caused by a parent's relocation; and

(11) any other relevant factors bearing on the child's best interests."  750 ILCS 5/609.2(g) (West 2016).

¶ 65    The party seeking judicial approval of the proposed relocation must establish by a preponderance of the evidence that the relocation is in the child's best interests.  See *Eckert*, 119 Ill. 2d at 325; see also *Collingbourne*, 204 Ill. 2d at 521 (observing that the best interests of the child is the "paramount question" that must be considered in a removal action); *P.D.*, 2017 IL App (2d) 170355, ¶ 15 (noting that parent seeking relocation has the burden of proving by a preponderance of the evidence that relocation would be in the child's best interests); *In re Marriage of Tedrick*, 2015 IL App (4th) 140773, ¶ 49 (noting that burden of proof in a removal case is a preponderance of the evidence).  In deciding whether relocation is in the child's best interests, a trial court should hear "any and all relevant evidence." *Eckert*, 119 Ill. 2d at 326.  We are mindful, however, that a determination of the child's best interests cannot be reduced to a simple bright-line test, but rather must be made on a case-by-case basis, depending to a great extent upon the circumstances of each case.  *Eckert*, 119 Ill. 2d at 326.  A reviewing court does not reweigh the competing considerations.  Rather, it reviews the trial court's decision deferentially.  As our supreme court has stated, " '[t]he presumption in favor of the result reached by the trial court is always strong and compelling in this type of case.' " *Eckert*, 119 Ill. 2d at 330 (quoting *Gallagher v. Gallagher*, 60 Ill. App. 3d 26, 31-32 (1978)); see also *P.D.*, 2017 IL App (2d) 170355, ¶ 18.  Such deference is appropriate because the trier of fact has significant opportunities to observe both the parents and, if applicable, the children, and therefore it is able to assess and evaluate their temperaments, personalities, and capabilities.  *Eckert*, 119 Ill. 2d at 330.  Accordingly, a trial court's determination of what is in the best interests of a child should not be reversed unless it is against the manifest weight of the evidence.  *Eckert*, 119 Ill. 2d at 328.  A court's decision is against the manifest weight of the evidence only where the opposite conclusion is clearly apparent or where its findings are unreasonable, arbitrary, or not based on

the evidence presented. *Best v. Best*, 223 Ill. 2d 342, 350 (2006).

¶ 66    As set forth above, the trial court specifically addressed the section 609.2(g) factors and considered the totality of the circumstances, and it ultimately granted respondent's motion for relocation. In light of the "strong and compelling" presumption favoring this result (*Eckert*, 119 Ill. 2d at 330), we conclude that the trial court's decision is not against the manifest weight of the evidence.

¶ 67    Petitioner raises various reasons why, in his opinion, the trial court's order granting relocation is against the manifest weight of the evidence. Petitioner's assertions can be categorized as follows. First, petitioner argues that the relocation will result in an unreasonable reduction in his parenting time. Second, petitioner argues that the relocation will drastically reduce the quality of his parenting time. Third, petitioner contends that the relocation will create a significant financial burden on his right to exercise his parenting time. Fourth, petitioner asserts that the trial court relied on findings that were contrary to or unsupported by the evidence. Finally, petitioner argues that the trial court placed too much emphasis on the improvement of the quality of respondent's life. We address each argument in turn.

¶ 68    Petitioner first argues that the relocation order results in an unreasonable reduction in his parenting time. We do not dispute that the relocation order results in a reduction in petitioner's parenting time. However, under the facts of this case, we do not agree that the reduction in parenting time renders the trial court's decision reversible.

¶ 69    The allocation judgment entered in February 2017 divided the parties' parenting time based on a two-week schedule. During the first week, petitioner's parenting time began on Wednesday at 5 p.m. and continued through Sunday at 5 p.m. During the second week, petitioner's parenting time began on Wednesday at 5 p.m. and continued through Friday at 5

p.m. The allocation judgment also provided that each party have three nonconsecutive weeks of parenting time during S.K.'s summer break, alternate parenting time on major holidays, and equal parenting time during spring and winter breaks. Under the trial court's August 2017 orders, however, petitioner was allocated time with S.K. every other weekend (alternating between Illinois and North Carolina) with extended time on long weekends, any additional time as agreed by the parties, any additional time in North Carolina at petitioner's election with 60 days' notice to respondent, five weeks of summer break (divided into one period of three consecutive weeks and one period of two consecutive weeks), half of winter break, and 75% of spring break (the whole spring break one year and half of spring break the next year). The post-relocation parenting-time schedule also provided that the parties alternate parenting time on S.K.'s birthday and eliminated the parties' birthdays, Halloween, New Year's, and Christmas. Thus, the post-relocation parenting-time schedule undoubtedly results in a reduction in petitioner's parenting time. See *In re Marriage of Demaret*, 2012 IL App (1st) 111916, ¶ 60 (acknowledging that reduced visitation by the noncustodial parent might be an unavoidable consequence of allowing a petition for removal).

¶ 70    Petitioner relies on math to argue that the reduction in his parenting time is unreasonable. He explains that, under the allocation judgment entered in February 2017, S.K. spent 6 nights with him during each 14-day period and they spent face-to-face time together on 8 of those 14 days. In addition, petitioner was awarded time with S.K. during summer, spring, and winter breaks, holidays, and birthdays. According to petitioner, under the allocation judgment, he had approximately 164 overnights in a given year, or 44.9% of the annual overnights. Following the relocation hearing, however, he has "a base summer and school year schedule of 82 overnights per year, or 22.46% of the overnights." According to petitioner, this is a substantial and

unreasonable reduction in parenting time, especially since the trial court found at the dissolution hearing that his relationship with S.K. was "closer than many dads."

¶ 71    Petitioner invoked this same position in his motion for reconsideration.  The trial court rejected petitioner's argument and we do not find it any more persuasive on appeal.  The trial court described the parenting time given to petitioner upon relocation as "generous" and "in excess of virtually every parenting schedule [it has] seen" in a relocation case.  Petitioner also argued in his motion for reconsideration that his parenting time had been cut from 164 overnights per year to 94 overnights per year.  The court rejected petitioner's calculation, describing it as "flawed" math.  The court explained:

> "A simple review of the court orders indicates this math is flawed.  How can you determine 94 days when you don't even know when he is going to come visit the child in North Carolina?  And again, counting number of days is not the test either.  The issue is quality of parenting time."

The court added that case law supports that "groups of time, as opposed to daily or every-other-day time[,] is sufficient and can be in the best interest of the child[ ].  That's what I found in this case."

¶ 72    The trial court's characterization of petitioner's calculation as "flawed" is not without foundation.  Before this court, petitioner attempts to explain the formula for his calculation in his brief, but he admits in a footnote that his formula "disregards the holidays and school breaks for simplicity."  In addition, the exact number of "annual overnights" petitioner was awarded under the February 2017 allocation judgment is not clear from petitioner's brief.  On one page of his brief, petitioner represents that "with all holidays and breaks included," he had "approximately 164 overnights in a given year."  On another page, petitioner states that he had "a base schedule

of 159 overnights per year" under the allocation judgment. On yet a third page, petitioner indicates that the allocation judgment provided him with "156 overnights annually." Petitioner also provides inconsistent information regarding the number of overnights after relocation. Petitioner represents that his annual overnights will be limited to 82. However, in his motion to reconsider, petitioner represented this number as 94. Based on this evidence, we cannot say that the trial court unfairly characterized petitioner's math as "flawed." Likewise, we note, as did the trial court, that it would be difficult to determine the exact reduction in petitioner's parenting time, because, under the August 2017 orders, the parties could agree to additional parenting time for petitioner and petitioner was allowed additional weekend visitation anytime in North Carolina with proper notice to respondent. Given these circumstances, we decline to find that the reduction in petitioner's parenting time is unreasonable.

¶ 73    Petitioner cites several cases that he asserts are factually similar to this one and support his claim that the trial court unreasonably reduced his parenting time. However, as noted, a determination of the best interests of a child "must be made on a case-by-case basis, depending, to a great extent, upon the circumstances of each case." *Eckert*, 119 Ill. 2d at 326; see also *In re Marriage of Berk*, 215 Ill. App. 3d 459, 465-66 (1991) (noting that, because the best interests of a child must be determined on the facts of each case, citation to and discussion of prior removal cases are of little value in determining whether removal should be allowed). In any event, while the cases petitioner cites all deal with involved fathers such as himself, they provide negligible assistance in reviewing the trial court's decision, because there are noteworthy factual differences between them and this case. Significantly, the reviewing courts in the cited cases did not rely only upon the decrease in ordered visitation. See, *e.g.*, *Shinall v. Carter*, 2012 IL App (3d) 110302 (reversing grant of petition to remove child to Colorado where the father's parenting

time would be reduced by half, there was no evidence that the move would enhance the minor's quality of life, the minor had extended family members in Illinois with whom she was strongly bonded, the travel involved would be expensive, the frequent and time-consuming travel requirements would be a burden upon the minor, and the minor would be without her primary caretaker (the mother) for weeks at a time); *Tysl v. Levine*, 278 Ill. App. 3d 431 (1996) (reversing grant of petition for removal of the minor to Georgia where the minor's visitation with the father would decrease "by at least 50%," the minor's interaction with other relatives in Illinois would be significantly diminished, the evidence relating to the quality of the minor's lifestyle in Georgia was "vague" and "uncertain," the average standardized test scores at the Georgia school the minor would attend were below the national average while the average standardized test scores at the Illinois school the minor attended were well above the national average, and the father was unsure how often he could travel given his modest salary); *In re Marriage of Johnson*, 277 Ill. App. 3d 675 (1996) (reversing grant of removal where proposed visitation schedule upon removal resulted in "at least" a 50% reduction in the father's visitation and the only possible benefit of removal arose from the mother's improved marital relationship with her new husband, which was insufficient to show that removal would enhance the minor's quality of life); *In re Marriage of Davis*, 229 Ill. App. 3d 653 (1992) (reversing grant of removal where proposed visitation schedule upon removal represented a 35% reduction in the father's visitation, the minor would be deprived of regular contact with her two brothers and her grandparents, the minor had no family living in Georgia, there was no evidence comparing the quality of the education the minor would receive in Georgia versus that in Illinois, there was no evidence that the quality of the minor's life would be enhanced by the proposed move given that the mother had not secured employment in Georgia, the mother's fiancé had not presented evidence to

support his claim of enhanced income, and the mother's claim that she would be able to spend more time with the minor was unclear); *Berk*, 215 Ill. App. 3d 459 (affirming denial of request to remove children to Canada to live with the mother and her new husband where the removal would result in the father having 18% fewer days of visitation, most members of the children's extended family resided in Illinois, the Canadian and American education systems differed, the children barely knew the mother's new husband, transportation between Illinois and Canada would be limited and expensive, and the mother would be employed at essentially the same income as in Illinois).

¶ 74    Petitioner next argues that the travel time and hotel stays required under the post-relocation parenting schedule will "drastically reduce the quality of [his] parenting time with [S.K.]" Petitioner contends that both he and S.K. will have to spend a significant amount of time each month simply traveling between North Carolina and Illinois. He further complains that his parenting time with S.K. in North Carolina will occur in a hotel room, not in his home where he and S.K. can share the normal, day-to-day interactions and experiences that S.K. has been able to enjoy with him for her whole life. However, petitioner cites no authority for the proposition that relocation should be denied on the basis that the noncustodial parent and the child will have to travel or stay in a hotel to see each other. As respondent notes, if this were so, relocation would never be granted. We note that, in granting relocation, the trial court considered travel issues at length, including petitioner's complaint that they would impact the quality of his parenting time. The court observed, however, that petitioner could adjust his work schedule, as he had in the past, to allow for longer weekends. The court also noted that the evidence showed "lots of direct flights between Chicago and Greensboro and Chicago and Raleigh" and that the airport in Greensboro is close to where respondent intends to live, thereby resulting in a shorter commuting

time.

¶ 75    Petitioner cites three cases on this issue, *In re Marriage of Krivi*, 283 Ill. App. 3d 772 (1996), *Shinall*, 2012 IL App (3d) 110302, and *Demaret*, 2012 IL App (1st) 111916. Again, we find that these cases provide negligible assistance in reviewing the trial court's decision, because there are noteworthy factual differences between them and this case. See *Krivi*, 283 Ill. App. 3d 772 (finding that proposed visitation schedule would require the father to travel 3400 miles by car between Illinois and Minnesota, thereby denying the father "any meaningful contact" with his children since most of the visitation time would be spent traveling in a car); *Shinall*, 2012 IL App (3d) 110302 (reversing a removal order in part because "the burden of the frequent and time-consuming travel requirements" would fall upon a three-year-old child. In *Demaret*, the appellate court affirmed the denial of the mother's petition for removal, in part because the time the father would have to spend traveling would curtail his weekend visitation with the children and staying in a hotel with the children would not be a substitute for the home environment he could provide in Illinois. *Demaret*, 2012 IL App (1st) 111916, ¶¶ 55-57. However, there was no evidence in *Demaret* that the father could modify his work schedule to accommodate the travel and prolong his visitation. *Demaret*, 2012 IL App (1st) 111916, ¶ 54 (noting that longer weekends would be difficult to put into practice, given the father's work schedule). In this case, petitioner acknowledged that he had made various requests to modify his work schedule since S.K. was born and that his employer had always accommodated his requests. We also note that the *Demaret* court questioned the mother's motives for seeking removal, finding that her request stemmed from her desire to control all aspects of the children's lives (*Demaret*, 2012 IL App (1st) 111916, ¶¶ 51-52), a factor that is not present in this case.

¶ 76    Citing *Demaret*, 2012 IL App (1st) 111916, ¶ 59, petitioner also claims that the relocation

order creates a significant financial burden on his right to exercise parenting time with S.K. Petitioner's reliance on *Demaret* is unclear, as he cites the court's discussion of the mother's proposal in that case to contribute $5000 toward travel expenses to allow the father to have a visitation schedule in New Jersey (where the mother proposed to move) similar to the one he had in Illinois. In *Demaret*, the visitation schedule in Illinois involved every other weekend, on Wednesday nights, and when the mother traveled for work. *Demaret*, 2012 IL App (1st) 111916, ¶ 59. However, the court found that the cost of travel alone undermined the mother's proposal, because the financial assistance she offered would cover only 22 round-trip tickets per year for the father and the four children. *Demaret*, 2012 IL App (1st) 111916, ¶ 59. Petitioner does not explain how this discussion applies here. More significantly, we find that petitioner's financial circumstances are quite different from those of the father in *Demaret*. In *Demaret*, the father's gross income fluctuated dramatically, as he earned $102,467 in 2008 and $32,819 in 2010. In the present case, the trial court found petitioner's annual gross income to be $119,000. Moreover, while the trial court ordered petitioner to pay all costs associated with exercising his parenting time in North Carolina, it required respondent to pay all costs related to S.K. traveling to Illinois for her parenting time with petitioner. Under these circumstances, we find nothing about the travel required in this case that would render relocation inappropriate.

¶ 77    Petitioner next argues that the trial court made a number of findings about benefits that S.K. would experience from the relocation to North Carolina, such as a higher income for respondent, insurance through respondent's new job, less time in daycare than she would need in Illinois, better housing, and free college tuition. According to petitioner, however, many of the trial court's findings about these benefits are contrary to or unsupported by the evidence.

¶ 78    As to respondent's income, the trial court found that respondent's income would increase

to $96,000. The court stated that this increase was "[n]ot great," but was still an indirect benefit to S.K. The trial court stated that the increased salary would allow respondent to pay the tuition at Westchester. We agree with petitioner that the trial court's finding that respondent would earn $96,000 per year at High Point University is contrary to the evidence. The record shows that respondent's salary at High Point University is actually $87,000, which is only slightly more than her salary at UIC. However, petitioner cites no authority that the lack of a significant salary increase is determinative. See *Davis*, 229 Ill. App. 3d at 662 (observing that an increase in standard of living alone is not determinative in removal case). We also point out that, while the trial court cited the purported salary increase as an indirect benefit to S.K., it also cited other factors related to respondent's job, including the fact that respondent would be required to be on campus only five hours a day and would have a shorter commute. The court found that this would give respondent more quality time with S.K.

¶ 79   Petitioner also asserts that any slight increase in respondent's salary will be offset by expenses that would not occur if S.K. remained in Illinois. As examples, petitioner cites the tuition at Westchester and the cost for S.K. and her chaperone to travel to Illinois each month. However, petitioner's argument ignores that respondent would also incur certain expenses if she remained in Illinois that she would not incur in North Carolina. For instance, the evidence established that Emerson will relocate with respondent and S.K. and will make a "substantial" down payment on the home they will reside in together. Emerson also stated that she will pay the real estate taxes, utilities, and insurance. This assistance would not be available if respondent remained in Illinois, as Emerson testified that she is not willing to move to the Chicago area if relocation is denied. In addition, petitioner ignores the fact that respondent is obtaining her Ph.D. for free in North Carolina. There was no evidence of any similar financial assistance in

Illinois if she were to remain here and pursue a Ph.D. Accordingly, we find this argument unpersuasive.

¶ 80　Petitioner next takes issue with the court's finding that respondent's employer-provided "health insurance and benefits" for herself and her family is a benefit to S.K., because the judgment of dissolution provides that petitioner has the responsibility to maintain health insurance for S.K. However, the court referenced not only the insurance but other benefits as well. In any event, petitioner cites nothing that would prohibit S.K. from receiving health insurance from both petitioner and respondent.

¶ 81　Petitioner next disputes the trial court's findings with respect to daycare. The trial court found that, if relocation is permitted, S.K. "will have less daycare." Petitioner suggests that this finding is not supported by the evidence. However, respondent testified that S.K. will not need daycare in North Carolina, because (1) Emerson is moving with them and can pick up S.K. from school when respondent is unable to do so and (2) respondent will be on campus for only five hours a day. Respondent further testified that, if she remained in Illinois, she "would assume" that S.K. would have to go to daycare. She explained that there were no academic positions available in the Chicago area, so she would be "forced to go back to being a clinician," with hours in the early morning, late at night, and on weekends to accommodate patients who work. Although admittedly we are dealing with "unknowable future events" (*P.D.*, 2017 IL App (2d) 170355, ¶ 33), the trial court's finding that S.K. will spend less time in daycare constituted a reasonable conclusion based on the evidence.

¶ 82　Petitioner nevertheless asserts that the evidence established that S.K. had not needed any daycare in Illinois since she started kindergarten in August 2016. He therefore concludes that "the status quo is not that [S.K.] needs daycare now, and it is inappropriate to compare her future

needs for daycare with what she needed before starting kindergarten." Petitioner's position is problematic for two principal reasons. First, as petitioner readily acknowledges, S.K. did go to daycare during petitioner's weekday parenting time in summer 2017 when she was not in school. Thus, petitioner misinterprets the "status quo." Second, petitioner's suggestion that the trial court compared "S.K.'s future need for daycare with what she needed before starting kindergarten" is without foundation. In concluding that S.K. "will have less daycare" in North Carolina, the trial court compared the daycare needs in North Carolina if relocation were allowed to the daycare needs in Illinois if relocation were denied. As noted previously, respondent testified that if relocation were denied she would have to quit her job at High Point University and obtain a position as a physical therapy clinician. This, in turn, would require weekend hours and earlier or later hours during the week. Emerson testified that she would not move to the Chicago area if relocation were denied. Petitioner posits that staying in Illinois would not necessarily result in more daycare for S.K. He explains that, given the "flexibility" of respondent's job at UIC, she could schedule her early morning, late evening, and weekend hours during his parenting time. However, petitioner cites no evidence that any scheduling flexibility respondent had at UIC would be available at a new position elsewhere.

¶ 83    Petitioner also suggests that respondent's testimony that she would be on campus for only five hours a day is speculative. He points out that Hegedus noted that "most people" stay on campus longer than five hours. Petitioner also complains that "less daycare in this situation means that [respondent's] 71-year-old mother is staying with [S.K.] as opposed to paying for an outside daycare." The fact remains that the trial court was satisfied, after hearing the evidence, that respondent's work hours and Emerson's presence would mean that S.K. would not need daycare. As noted, the trial court's findings are entitled to great deference (see *Eckert*, 119 Ill.

2d at 330), and, given the evidence presented in this case, petitioner's arguments do not present a compelling reason to set aside the court's finding regarding daycare.

¶ 84 Petitioner next argues that the trial court should not have compared the housing in North Carolina to respondent's temporary apartment in Illinois, as opposed to the marital residence in Downers Grove. This argument finds no basis in the record. It is true that at the relocation hearing respondent testified to her living situation in Illinois after she moved out of the marital home. It is also true that in the course of its ruling the trial court discussed housing in North Carolina. The trial court stated that, "[a]s to residences, [respondent] has looked and plans to buy, with the help of her mother's money." The court also commented that respondent "claims the housing she looked at [in North Carolina] is better housing, bigger for less money and more yard and more space." The court later remarked that petitioner "argued a bigger and nicer residence in North Carolina expected by [respondent] is rank speculation. He's probably right there." We find no evidence, however, that the trial court compared respondent's housing in North Carolina to her apartment in Illinois, and petitioner directs us to nothing in the record to support such a claim.

¶ 85 Petitioner next argues that the benefit of free college tuition at High Point University is too tenuous to justify relocation. Petitioner asserts that there was no basis for concluding anything about S.K.'s college plans at this point, since she was only 6 years old and would not attend college for another 12 years. Although the time frame involved might reduce the significance of the availability of free tuition, we nevertheless conclude that it was reasonable for the trial court to find that this benefit would accrue to S.K. as a result of relocation. Accordingly, we reject petitioner's claim that the trial court improperly relied on this evidence in support of its decision to grant the motion to relocate.

¶ 86     Finally, petitioner argues that the trial court erred in considering the improvement to the quality of respondent's life, because it is not a factor under section 609.2(g) (see 750 ILCS 5/609.2(g) (West 2016)).  In support of his position, petitioner primarily relies upon *P.D.*, 2017 IL App (2d) 170355.[1]

¶ 87     In *P.D.*, this court found that, in enacting section 609.2(g) of the Act (750 ILCS 5/609.2(g) (West 2016)), the legislature "omit[ted] the first *Eckert* factor [(the likelihood that the proposed move will enhance the general quality of life for both the custodial parent and the child)], reference[d] only the best interests of the child, and [did] not mention the custodial parent."  *P.D.*, 2017 IL App (2d) 170355, ¶ 34.  We then stated that, "[g]iven the new statutory directives, *** the reasoning of *Eckert* and *Collingbourne* and progeny, to the extent it requires weighing the likelihood that the move will enhance the custodial parent's quality of life, is unhelpful in evaluating the trial court's best-interest determination in the case before us."  *P.D.*, 2017 IL App (2d) 170355, ¶ 36.  Petitioner suggests that, under *P.D.*, the correct approach in a relocation case is to focus on whether the quality of the child's life is enhanced, not the quality of the custodial parent's life.

¶ 88     In essence, petitioner interprets *P.D.* as holding that a trial court may not consider whether relocation would benefit the parents.  We reject this position.  In *P.D.*, this court simply recognized that, in enacting section 609.2 of the Act (750 ILCS 5/609.2 (West 2016)), the legislature "intended to emphasize the child's best interests over those of the custodial parent."  *P.D.*, 2017 IL App (2d) 170355, ¶ 36.  Although we found that cases requiring consideration of

---

[1] Although *P.D.* was released after the trial court's August 2017 orders, petitioner alerted the court to the case and the court discussed the case in addressing petitioner's motion to reconsider.

"the likelihood that the move will enhance the custodial parent's quality of life" were "unhelpful" (*P.D.*, 2017 IL App (2d) 170355, ¶ 36), nothing in *P.D.* prohibits a court from considering an enhancement to the custodial parent's quality of life. In fact, in deciding a motion to relocate, section 609.2(g)(11) (750 ILCS 5/609.2(g)(11) (West 2016)) directs the court to consider "any other relevant factors bearing on the child's best interests."

¶ 89    Petitioner suggests that in *P.D.* we rejected the argument that section 609.2(g)(11) permits a court to consider an enhancement to the custodial parent's quality of life. We disagree. The custodial parent in *P.D.* argued that section 609.2(g)(11) "might be the appropriate place to consider the impact of the move on [her] life." *P.D.*, 2017 IL App (2d) 170355, ¶ 47. In addressing this argument, we responded, "we believe the trial court properly placed consideration of P.D.'s best interests above the likely enhancement to [the custodial parent's] general quality of life as a result of relocating to New Jersey." *P.D.*, 2017 IL App (2d) 170355, ¶ 47. We read nothing in this language to prohibit a court from considering an enhancement to the custodial parent's quality of life under section 609.2(g)(11), as long as the court is satisfied that it has a bearing on the child's best interests.

¶ 90    Petitioner nevertheless asserts that respondent had a good job in her field at UIC that she "loved" but that she voluntarily left it to take a similar job in North Carolina earning a comparable salary. Given these circumstances, petitioner concludes, any "financial necessity giving rise to the indirect benefit to the child is absent in this case." As part of its consideration of the factors set forth in section 609.2(g) (750 ILCS 5/609.2(g) (West 2016)) and the factors set forth in section 602.7 (750 ILCS 5/602.7 (West 2016)), the trial court noted the benefits to S.K. and to respondent that would result from the relocation. Ultimately, the court concluded that S.K. "will benefit both directly and indirectly if relocation is granted." The court cited more than

financial benefits to S.K. Among the benefits the court cited were those involving "daycare and college and benefits and housing." For instance, the court noted that respondent's work hours and commute in North Carolina would allow her to spend more time with S.K. and S.K. to spend less time in daycare. The court also noted that respondent and S.K. will have extended family in North Carolina, as Emerson plans to move with them. Further, S.K. will have access to respondent's employment benefits, including a tuition benefit at High Point University. In other words, the court found that allowing the relocation will improve the quality of S.K.'s life by facilitating respondent's involvement in more of S.K.'s day-to-day care, enabling more frequent contact with Emerson, and providing other benefits appurtenant to respondent's employment.

¶ 91    In conclusion, the trial court specifically addressed the section 609.2(g) factors and, based on the totality of the circumstances, granted respondent's motion for relocation. Again, a "strong and compelling" presumption favors the result reached by the trial court, as it had the opportunity to observe the parties and thus was able to assess and evaluate their temperaments, personalities, and capabilities. *Eckert*, 119 Ill. 2d at 330. The fact that the evidence in this case was close, as recognized by the court and the parties' experts, strengthens this presumption. For the reasons set forth above, and after careful consideration of the record, we cannot say that the court's decision is against the manifest weight of the evidence.

¶ 92                    B. School Enrollment

¶ 93    Petitioner also argues that the trial court erred in *sua sponte* ordering that S.K. be enrolled at Westchester. According to petitioner, the trial court acted contrary to proper procedure, because no pleadings presented the court with the question whether S.K. should attend the school. See *Suriano v. Lafeber*, 386 Ill. App. 3d 490, 492 (2008) ("[I]f a justiciable issue is not presented to the court through proper pleadings, the court cannot *sua sponte* adjudicate an

issue."). Further, petitioner asserts that the ruling was contrary to the allocation judgment, which provides that, if the parties cannot agree about a significant issue, they are required to mediate the dispute.

¶ 94    We reject petitioner's contention that the question of S.K.'s enrollment at Westchester was not before the court. Respondent stated in her motion for relocation that, if relocation were granted, she would enroll S.K. in a private school in North Carolina. Respondent prayed for entry of an order granting her leave to relocate and for "such other relief as [the] Court may find reasonable and just." Further, at the relocation hearing, the parties presented extensive testimony regarding the educational opportunities for S.K. in both North Carolina and Illinois. Respondent testified that she researched several schools in North Carolina and thought that Westchester was the best "fit" for S.K. Respondent told petitioner about Westchester, informed him of when admission testing would occur, and encouraged him to talk with representatives of the school. According to respondent, however, petitioner did not contact the school. Petitioner acknowledged that respondent told him about Westchester. He stated that he objected to respondent's taking S.K. to be tested at the school. He added that he "never agreed" to the school but did not "object" to it. Petitioner testified that his concern was that the classes at Westchester are too small. Thus, the issue of S.K.'s educational opportunities was placed squarely before the court.

¶ 95    Moreover, while the allocation judgment sets forth a procedure to resolve disagreements concerning significant issues, petitioner does not explain how reversing this provision of the trial court's order would serve S.K.'s best interests. Indeed, at the relocation hearing petitioner did not advance any cogent reason for opposing S.K.'s enrollment at Westchester. His only concern was that the classes at Westchester are too small. However, petitioner did not indicate why this

was problematic. Finally, we observe that petitioner is under no financial obligation for the tuition at Westchester. For all of the foregoing reasons, we reject petitioner's argument that the trial court erred in *sua sponte* ordering that S.K. be enrolled at Westchester.

¶ 96                                      III.  CONCLUSION

¶ 97    For the reasons set forth above, we affirm the judgment of the circuit court of Du Page County granting respondent's motion to relocate to North Carolina.

¶ 98    Affirmed.