2022 IL App (1st) 220243-U

SIXTH DIVISION
August 26, 2022

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | |
|---|---|
| *In re* THE MARRIAGE OF | ) |
| | ) Appeal from the |
| TOMASZ JARECKI, | ) Circuit Court of |
| | ) Cook County. |
| Petitioner-Appellant, | ) |
| | ) No. 18 D 9835 |
| v. | ) |
| | ) Honorable |
| KATARZYNA GNACY-JARECKI, | ) Daniel A. Trevino, |
| | ) Judge Presiding. |
| Respondent-Appellee. | ) |

JUSTICE MIKVA delivered the judgment of the court.
Justices Oden Johnson and Mitchell concurred in the judgment.

**ORDER**

¶ 1    *Held*:   The judgment of the trial court granting mother's petition to permanently relocate with the parties' minor child to New York City is affirmed. The trial court did not ignore relevant evidence and its finding that relocation is in the minor's best interests was not against the manifest weight of the evidence.

¶ 2    Following its consideration of extensive witness testimony, documentary evidence, and the recommendations of the guardian *ad litem* (GAL), the trial court in this case issued a 26-page written decision finding that six of the ten specified statutory factors weighed in favor of granting a petition filed by Katarzyna Gnacy-Jarecki (Kasia), over the objections of her ex-husband Tomasz

Jarecki (Tom), to permanently relocate with their son Casper to New York City. The court found the other four statutory factors were neutral. For the reasons that follow, we are not persuaded that the presumption in favor of the result reached by the trial court is overcome here. We conclude that the court's findings as to each of the factors and its overall finding that relocation will be in Casper's best interests are not against the manifest weight of the evidence.

¶ 3                                 I. BACKGROUND

¶ 4      Kasia and Tom met online in approximately 2014 and began dating in 2016. Tom was a long-distance truck driver living in the Chicago area; Kasia worked for a surveying company and lived in New York City. Both are originally from Poland. As their relationship progressed, Tom moved in with Kasia and the two lived together in New York City for about six months. They were married there on January 13, 2017, and Kasia soon learned that she was pregnant. Kasia and Tom then moved to Chicago, where their son Casper was born on October 10, 2017. Their relationship soon deteriorated, however, and on November 7, 2018, Tom filed for divorce. The parties entered into an agreed judgment for allocation of parental responsibilities and parenting time on August 28, 2019 (agreed judgment), and their divorce became final on December 26, 2019.

¶ 5          A. Tom and Kasia's Agreement Regarding the Allocation of Parenting Time

¶ 6      The parties both waived spousal support and Tom agreed to pay $660 per month in child support. They share joint custody of Casper, with Kasia primarily responsible for medical and educational decision-making. Responsibilities for extracurricular activities, childcare, and uncovered medical expenses are shared. Tom was allocated parenting time with Casper on alternating weekends (Saturdays and Sundays from 10:00 a.m. to 7:00 p.m.) and, upon two days' notice, one weekday visit per week, from after day care until 7:00 p.m. The parties contemplated that when Casper turned four, Tom's alternating weekends with him would extend overnight

2

(Saturday at 10:00 a.m. until Sunday at 7:30 a.m.) and that these visits would later be expanded to include Friday evenings. At the suggestion of the guardian GAL, Tom's overnight visits began in March 2021, before Casper turned four. Tom was allocated overnight visits on an alternating basis for New Year's Eve, Christmas Eve, and Christmas Day. The parties' agreement made no special arrangements for summer vacation or winter or spring breaks from school.

¶ 7                                  B. Kasia's Petition for Relocation

¶ 8      On December 29, 2020, Kasia petitioned the court to permanently relocate with Casper to New York City. She represented to the court that she had a better job waiting for her there, Casper's day care would be only two minutes from her place of employment, friends of hers who lived there could provide her with free or discounted childcare, Casper would attend a better school, she would benefit from a stronger support system, and Casper would enjoy an overall higher standard of living. Tom's parenting time would not be adversely affected and his relationship with Casper would not be impaired if relocation was granted, Kasia maintained, because Tom was financially able to travel to New York. In her petition, Kasia said that Tom routinely violated the agreed judgment by, for example, failing to advise her of when he could take Casper and not using all of his weekday parenting time. She also detailed what she described as Tom's history of exerting control over her and argued that his opposition to the proposed relocation was "rooted in bad faith."

¶ 9      In his written response to the petition, Tom denied that he was trying to exert control over Kasia. He noted that, historically, whenever the two had argued, Kasia had threatened to flee with Casper to Poland or New York City. Tom explained that his employment as a truck driver made it difficult for him to give Kasia the two days' notice required for him to exercise weekday parenting time, but when he had been able to do so, Kasia had denied his requests. Tom also insisted that the proposed relocation would "absolutely" have an adverse effect on his parenting time. He feared

that he and Casper would grow apart and Casper "[might] not want to spend overnights with him if he only [saw] him once every month or every other month."

¶ 10                              C. The Evidence Presented at Trial

¶ 11    The trial court heard the testimony of five witnesses over seven days in the fall and winter of 2021: Kasia, Tom, Kasia's friend Maciej Szpakowski (Matt), Tom's sister Ann Osiecki, and Agnes Olechno, the GAL. The court also received documentary evidence including financial affidavits, the parties' tax returns, bank statements, a letter offering Kasia a job in New York City, text messages and social media posts, and an order of protection entered for Tom's ex-girlfriend.

¶ 12                              1. Tom and Kasia's Early Relationship

¶ 13    Kasia explained that when they were first dating in 2016, she lived in Maspeth, a neighborhood of Queens, in New York City, and made $20 per hour doing administrative work for Roguski Land Surveying. Kasia had lived in New York City at that point for about 14 years. She had made friends with a number of other Polish immigrants in her neighborhood and they "treated each other as family." Tom was a long-distance truck driver at that time. Kasia testified that during the first six months of their relationship, he came to see her every weekend, sometimes flying and sometimes driving his truck. Tom moved in with her in June or July of 2016 and they were engaged by Thanksgiving of that year.

¶ 14                              2. The Move to Chicago

¶ 15    Kasia testified that soon after Tom moved to New York City, he began trying to convince her to move back to Chicago with him. She was unsure about the plan but finally decided to give it a try. They moved to a two-bedroom apartment on the north side of Chicago in March 2017. Kasia was not employed at that time. She was learning the area, looking for a doctor, setting up health insurance, and "taking care of the house in general." Tom had switched to local truck

driving. Although this allowed him to be home at night during the week, he did not get home until late.

¶ 16    Kasia testified that when she moved to Chicago, Tom promised her "it was just a try." If she did not get used to it, they could move back to New York City, and, subject to finances, she could visit her friends anytime she wanted. Tom explained that he had a good job in Chicago and if she moved there, she would not need to work and could take care of the baby. At trial, Tom agreed that these were the representations he made to Kasia.

¶ 17                                    3. Casper's First Year

¶ 18    Kasia gave birth to Casper by cesarian section. She arrived home from the hospital on a Friday and Tom was back to his normal work schedule by the following Monday. There was no one to assist her with the baby and she had no access to a car. Tom explained that they could not afford a second car and he tried to find other transportation to work when he could so he could leave Kasia the car.

¶ 19    When Casper was around three months old, Kasia wanted to take him to New York City to introduce him to her friends and thank them for the gifts and cards they had sent. Tom initially said they could not afford it, but "[a]fter many difficult conversation[s]," Kasia and Casper did make the trip in February 2018, staying with Kasia's friend Beata for three days and her friends Gosha and Matt for four additional days. According to Kasia, Tom called up to ten times a day, constantly asking where they were, who they were with, what they were doing, and when they were coming home. Although there was no basis for such suspicions, Kasia believed that Tom thought she was having an affair with Matt.

¶ 20    Kasia said that when she and Casper returned from their visit to New York, her marriage "changed for the worse." Tom "was upset just to hear about New York" and told her she would

never go back there again. She tried explaining how important her friends there were to her and "he didn't want to listen." In March 2018, when she told him that she wanted to visit New York more than once a year, Tom took away her green card and told her he was going to destroy it. He gave it back to her only after she called the police.

¶ 21    Several months later, in June 2018, Kasia was planning to take Casper to visit her family in Poland. Tom had told Kasia that he "had a problem" with his ex-girlfriend, who "took his car away and didn't want to give it back to him." That summer, however, she found some court documents in their apartment indicating that Tom had a felony conviction for stalking. At trial, Tom acknowledged that he had pleaded guilty to the charge in 2014. When Kasia asked him about it, he said it was "none of [her] business." She used a ride share service to meet with Tom's ex-girlfriend and when she returned, Tom searched her cell phone and found an e-mail confirming the trip. He again believed she was cheating on him. When she explained to him where she had been, he "got very nervous and upset." He told her he was canceling the tickets he had purchased for her and Casper to go to Poland, said that they were "not going to go anywhere," and "just took Casper's passport and hid it somewhere in the car." Kasia again called the police, the passport was located, but the police would not give it to Kasia because Tom told them she was going to kidnap Casper. Kasia and Casper eventually did go to Poland for two months. Tom agreed that this was not a kidnapping. Tom joined them for the last two weeks of the trip, which they spent amicably, and they returned to Chicago together in September 2018.

¶ 22    Kasia testified that when they returned from Poland, however, Tom "was just always upset and angry." They had an argument one day when Casper was almost a year old, and Tom told her he was going to move out. He took some things, left her the car to use, and said he would be back the next weekend to see Casper. Kasia was shopping with Casper during the middle of the week

when Tom called her and said he wanted to see Casper right away. She told him it was not a good time, and he became angry. He told her if she did not return to the apartment in 15 minutes, he would call the police and tell them she had stolen his car. She returned to the apartment, they began arguing, and Tom "started to scream that [she] cut him with a knife," raising his voice so that the neighbors would hear him. Kasia panicked and called the police to "show them that nothing really happened." At this point, the police told Tom and Kasia that one of them had to leave the apartment. Kasia decided to move with Casper to a shelter for Polish mothers. By the end of 2018, Tom had filed for divorce.

¶ 23    Kasia stayed at the shelter for six months, or until May 2019. Tom visited Casper during this time once a week or every other weekend. Despite their problems as a couple, Kasia knew it was important for Casper to have a relationship with his father. After a few weeks, Tom began voluntarily paying Kasia $200 a week so that she could get Casper into a day care she had found. Kasia agreed that it was a "difficult time" for her.

¶ 24    Kasia acknowledged that she had been the complaining witness in a Department of Children and Family Services investigation into Tom, accusing him of child abuse for "stressing out the baby." She explained that he had been holding Casper in his arms while they were fighting and when he began screaming that she was cutting him with a knife. The investigation was ultimately closed.

¶ 25    Tom's sister Ann confirmed that Kasia and Tom argued and that the police had been called to their home. Kasia had called Ann once in tears, asking to be picked up from a hotel she was staying at. Ann believed, however, that Tom had tried to make his marriage work. She agreed that he was controlling toward Kasia but explained that this only happened after Kasia's friend Matt "started to butt into [their] marriage." Ann agreed that she also quarreled sometimes with Tom.

When Casper was born, she had in fact not spoken to her brother for over a year.

¶ 26    Tom testified that Kasia took Casper to Ohio without his consent over Thanksgiving 2020 to visit friends of hers, depriving him of his allocated parenting time. Kasia notified Tom one week in advance that she and Casper would be making the trip. According to Ann, Tom asked her to call the local police in Ohio, because her English was better than his, and report a kidnapping. Ann did so, and the police apparently did find Kasia and speak with her in Ohio. When asked if she knew that Kasia had told Tom in advance that she would be taking Casper to Ohio, Ann said she did not "remember those circumstances." When asked how she thought her false reporting of a kidnapping made Kasia feel, Ann said "[t]hat is not of interest to me." And when asked how the sight of multiple police officers converging on the Thanksgiving celebration may have affected Casper, Ann speculated that he likely would have been napping.

¶ 27                    4. Kasia and Casper's Current Living Situation

¶ 28    Kasia testified that since May 2019 she has lived in an 800-square-foot, one-bedroom apartment on the north side of Chicago. She sleeps in the living room and Casper, who was almost four years old at the time of trial, sleeps in the bedroom. Kasia pays $1,100 per month in rent and the term of her rental is month-to-month. The preschool Casper attends is 10 minutes from their apartment.

¶ 29    Kasia works at an accounting office for $13 per hour. Her gross income for 2019 was $17,391. She is considered an independent contractor and does not receive health or life insurance, paid sick days, or retirement benefits. After two years of employment, she now receives two weeks' (10 days) of vacation. Casper currently has health insurance through the All Kids state-funded health insurance program.

¶ 30    Kasia had $5000 in "emergency funds" saved from before she married Tom and used that

to buy a used car for $3500 when she left the shelter. A year later, however, she started leasing a new vehicle for $350 a month. She receives no spousal support from Tom following the divorce, but he pays her $660 a month in child support.

¶ 31    Kasia explained to the court that she does not have any friends in Chicago. Her mother visited her from Poland when Casper was around three months old, and Tom's sister Ann, who lives in Chicago, paid a visit around that same time. All of Kasia and Tom's other family still live in Poland.

¶ 32    Ann agreed that she had no relationship with Kasia. She explained that she opposed the relationship from the start and did not attend the wedding. When asked why she did not think Kasia was a good match for her brother, Ann explained that she did not like how Kasia was quiet sometimes, listening to what others said before offering her own views. In Ann's opinion, "[t]hose kinds of people are usually deceitful." Ann insisted that, despite her misgivings, she had tried to have a good relationship with Kasia when Tom and Kasia first moved to Chicago. When asked how many times the two would see each other, however, Ann said "I've got so many friends, you know, and it's so long ago. I just don't remember." Ann now works as an accountant, three days in the office and two at home, until around 3 or 4 p.m., and lives in Hoffman Estates, about 30 minutes away from Tom. She has never provided daycare for Casper.

¶ 33                         5. Tom's Relationship With Casper

¶ 34    When asked how much Tom helped her with Casper's care before they were divorced, Kasia said "I didn't really get help from him." She acknowledged that "[h]e gave Casper [a] bath a few times" and "fed him a few times also when he got home early." Following the divorce, Kasia is responsible for Casper's day-to-day care. She is the one who takes him to medical appointments, attends functions at his daycare, drops him off at daycare, and usually the one who picks him up

from daycare. Kasia estimated that Tom has taken advantage of his weekday parenting time only about once a month. He has never asked to video conference with Casper.

¶ 35    Tom testified that in his current position as a local truck driver, he works Monday through Friday, sometimes starting work as early as 6 a.m. and ending as late as 7 p.m. He is rarely home before 3 or 4 p.m. Tom denied refusing to assist Kasia with childcare during the pandemic. Their arrangement, he explained, was for an agreed-upon babysitter to watch Casper, and he contributed to that cost. Tom stated that he had never failed to exercise his weekend parenting time and, since the allocation agreement was modified in March 2021 to provide him regular weekday visitation on Thursdays, he has been able to arrange his work schedule accordingly and has not missed any of those visits either. He detailed for the court the foods he cooks for Casper, their bath time and bedtime routines, and activities they regularly engage in, including going to the park, swimming, visiting a trampoline park, and visiting Ann and her son.

¶ 36    Ann testified that she had been "on good terms" with her brother for the past two years. She and her son had typically seen Casper every other weekend and on some weeknights, when Casper stayed with Tom. Ann believed that Casper loved his father and got along well with him.

¶ 37    Tom explained to the court that he opposed Kasia's petition because he wanted to raise and educate Casper in Chicago. Education was important to him, and he agreed with Kasia that Casper should attend a Polish language school. He had not researched any particular schools, however, because Casper was still so young. Tom also believed Kasia only wanted to relocate to New York to be closer to her friends. He blamed them for encouraging her in this regard. Overall, Tom had a desire to "partake in [Casper's] daily life" and "bring him up in a certain way."

¶ 38                            6. Kasia's Prospects in New York City

¶ 39    Kasia explained to the court that she is interested in moving back to Maspeth, the

neighborhood in Queens, New York, where she lived before she met Tom. She has researched apartments there and received three offers recently for apartments similar in size to the one she currently rents that are being offered for rents that vary from $1100 to $1300 per month. Her friends in Maspeth have been helping her look for apartments in their buildings. Kasia explained that she has also found a preschool and a secondary school that are within walking distance of the neighborhood she is interested in. Kasia went through a list she had provided to the GAL of her friends in New York City, answering questions about how she knew them, whether they had children Casper's age, and how often she kept in touch with them.

¶ 40    Kasia's friend Matt agreed that she had a strong support system of close friends in New York City. He described his wife Gosha and Kasia as "best friends." Kasia was their son's godmother and they considered Casper a cousin to him. Matt and Gosha had visited Kasia in Chicago shortly after Casper was born, and she and Casper had visited them in New York in February of 2017. Although Matt acknowledged on cross-examination that he and his wife live 20 to 25 minutes away from the area Kasia intends to move to and both typically worked weekdays until 5 p.m., he explained that Kasia had helped them care for their son when he was young, and they would find a way to help her too, even if Gosha had to leave work early.

¶ 41                         D. The Guardian *Ad Litem*'s Recommendation

¶ 42    Guardian *ad litem* Agnes Olechno testified consistently with her written report, issued on August 17, 2021. In preparing her report, Ms. Olechno spoke with both parties on a number of occasions, met with Casper at Tom's residence, and observed Casper and Kasia by video conference. She attended the parties' depositions and interviewed Tom's sister Ann, Kasia's friend Matt, and three other friends of Kasia's who lived in New York. She reviewed the pleadings and discovery materials in this matter, including text messages and other supporting documents

provided by the parties, and she conducted research to compare the quality of schools, crime rates, and cost of living in Chicago and Queens.

¶ 43    Ms. Olechno did not provide an opinion regarding which of the specific statutory factors relevant to relocation petitions weighed in favor of relocation and which were neutral or weighed against relocation. She did, however, discuss at length the facts that were relevant to each factor. Regarding Kasia's reasons for wanting to relocate, Ms. Olechno reported that although the cost of living was "substantially more" in New York than in Chicago and the rent for a 1-2 bedroom apartment in the area Kasia planned to live would be $500-$700 more per month, Kasia could expect to make approximately $13,000 more per year at her new job in New York, a position that would also offer her health insurance and paid vacation, sick days, and holidays. Pre-K was also free in New York, unlike in Chicago, and Ms. Olechno had confirmed with Kasia's friend Beata Kozyniak that Ms. Kozyniak would be available to watch Casper as needed for free or for minimal cost. Kasia would also likely not need a car in New York, due to the easily accessible public transportation and the proximity of various locations. Ms. Olechno reported that Queens has a crime index of 37, meaning it is safer than 37% of U.S. cities, while Chicago has a crime index of only 8%. Ms. Olechno noted that Kasia also wanted to move to New York because living in Chicago near Tom caused her a great deal of stress and she did not want Casper to see her crying all of the time.

¶ 44    Tom's opposition to relocation, Ms. Olechno noted, was related to "the frequency of parenting time he would have with Casper, as opposed to the totality of time." Tom wanted to raise and educate his son in Chicago. He believed there were no positive benefits for Casper from living in New York and that Kasia only wanted to relocate to be closer to her friends. Ms. Olechno found Tom's objection to be genuine. She believed he loved his son and would not be able to see him on

a weekly basis if the relocation occurred. She did feel, however, that Tom felt "threatened with the idea of Kasia living closer to her friends in New York," whom he had "isolated himself from *** due to his own actions."

¶ 45    Although both parents had a good relationship with their son, Ms. Olechno noted that Casper was "much more closely bonded to Kasia than he [was] to Tom given the amount of time that he [spent] with her and the minimal time that he [spent] with Tom." Tom exercised minimal weekday parenting time because he drove trucks long distances and his work schedule was unpredictable. During the pendency of the case, Tom had never asked for more parenting time. Rather, it was always Ms. Olechno who advocated for his parenting time to be increased. Although Tom had consistently provided child support and contributed to daycare costs, he was "minimally involved" in Casper's day-to-day care, something that fell "squarely on Kasia's shoulders."

¶ 46    Ms. Olechno further noted that schools in New York were not significantly better than those in Chicago, support for Kasia in caring for Casper was "far more available" from her friends in New York than from Tom or his sister in Chicago, and there would be several direct benefits to Casper from living in New York, including the availability of private health insurance. She also concluded that there would be "significant indirect benefits" to him as well, "in that he [was] very close to his mother and Kasia would be much happier" in New York and "would probably have a better quality of life."

¶ 47    Ms. Olechno believed a reasonable allocation of parenting time could still be fashioned if relocation was granted. She noted that Tom had transitioned from long- to short-distance trucking when Casper was born and that he could presumably transition back again (he did so briefly during the parties' divorce) and see Casper whenever his routes took him east.

¶ 48    Ms. Olechno concluded by noting that "[r]emoval cases are difficult and this one is no

different." She believed Casper had two loving parents, neither parent had demonstrated bad faith, and, "no matter the outcome, one party's life [would] be affected detrimentally." Considering all of the evidence, however, she believed it would be in Casper's best interests for the court to grant Kasia's petition.

¶ 49                    E. The Trial Court's Ruling Granting the Petition

¶ 50    In its order summarizing the extensive testimony and explaining its reasoning as to each factor, the trial court granted Kasia's petition for relocation. The court found that six of the ten statutory factors (Kasia's reasons for requesting the relocation, Tom's reasons for opposing it, the history and quality of the parents' relationships with their child, the presence or absence of extended family in each location, the anticipated impact of the relocation on the child, and the ability of the court to fashion a reasonable allocation of parental responsibilities if relocation occurred) all favored relocation. The other four factors (educational opportunities, the wishes of the child, possible arrangements for the exercise of parental responsibilities appropriate to the parents' resources and circumstances, and the possibility of minimizing any impairment to the relationship between the child and the non-relocating parent) the court considered to be neutral.

¶ 51    The court ordered Tom's parenting time following relocation to be one weekend per month from 6 p.m. on Friday to 6 p.m. on Sunday, with Kasia flying Casper to Chicago at her own expense during odd months and Tom traveling to New York at his own expense during even months. Tom was also granted one additional weekend per month in New York on 21 days' notice; every other Memorial Day, Independence Day, and Labor Day; Father's Day; every other spring break; half of summer break; and half of winter break, with travel expenses for spring, summer, and winter breaks to be shared equally by the parties.

14

¶ 52                                    II. JURISDICTION

¶ 53    The trial court granted Kasia's petition to relocate on February 14, 2022. Tom filed his notice of appeal on February 22, 2022. We have jurisdiction pursuant to Illinois Supreme Court Rules 301 (eff. Feb. 1, 1994) and 303 (eff. July 1, 2017), governing appeals from final judgments entered by the circuit court in civil cases.

¶ 54                                    III. ANALYSIS

¶ 55    A trial court's "paramount consideration" in ruling on a petition for relocation is what will be in the best interests of the child. *In re Marriage of Fatkin*, 2019 IL 123602, ¶ 32. Because a child has an interest in maintaining significant contacts with both parents following a divorce, "the mere desire of the custodial parent to move to another State, without more, is insufficient to show that the move would be in the [child's] best interest." *In re Marriage of Eckert*, 119 Ill. 2d 316, 325 (1988). Section 609.2 of the Act enumerates the following factors a court should consider when making this determination:

> (1)    the circumstances and reasons for the intended relocation;
>
> (2)    the reasons, if any, why a parent is objecting to the intended relocation;
>
> (3)    the history and quality of each parent's relationship with the child and specifically whether a parent has substantially failed or refused to exercise the parental responsibilities allocated to him or her under the parenting plan or allocation judgment;
>
> (4)    the educational opportunities for the child at the existing location and at the proposed new location;
>
> (5)    the presence or absence of extended family at the existing location and at the proposed new location;
>
> (6)    the anticipated impact of the relocation on the child;

15

(7)     whether the court will be able to fashion a reasonable allocation of parental responsibilities between the parents if the relocation occurs;

(8)     the wishes of the child, taking into account the child's maturity and ability to express reasoned and independent preferences as to relocation;

(9)     possible arrangements for the exercise of parental responsibilities appropriate to the parents' resources and circumstances and the developmental level of the child;

(10)     minimization of the impairment to a parent-child relationship caused by parent's relocation; and

(11)     any other relevant factors bearing on the child's best interests."

750 ILCS 5/609.2(g) (West 2020).

This list is not exclusive, and, as our supreme court recognized even before such considerations were codified, no one factor is controlling. *In re Marriage of Collingbourne*, 204 Ill. 2d 498, 523 (2003). The weight to be given to each factor will instead depend on the facts of the case. *Id.* The party seeking relocation must establish by a preponderance of the evidence that relocation is in the child's best interests (*In re Kavchack*, 2018 IL App (2d) 170853, ¶ 65), and the court may base its decision on "any and all relevant evidence" (*Eckert*, 119 Ill. 2d at 326).

¶ 56     As our supreme court has noted, a "presumption in favor of the result reached by the trial court is always strong and compelling in this type of case." *Id.* at 330. We will reverse the trial court's determination of what is in the best interests of the child only where "it is clearly against the manifest weight of the evidence," and "it appears that a manifest injustice has occurred." *Id.* at 328. A finding is against the manifest weight of the evidence where "the opposite conclusion is clearly evident" or "the finding itself is unreasonable, arbitrary, or not based on the evidence

16

presented." *Best v. Best*, 223 Ill. 2d 342, 350 (2006).

¶ 57    In this appeal, Tom argues that the trial court's findings that the first, second, third, fifth, and sixth factors each favored Kasia were against the manifest weight of the evidence. He additionally argues that the court ignored negative evidence about Kasia when it concluded that the fourth and tenth factors were neutral. We address each of these arguments, in turn.

¶ 58    As to the first and second factors, the parties' reasons for seeking and opposing relocation, the trial court clearly found Kasia to be the more credible witness. The court summarized over several pages her testimony that she was Casper's primary caretaker; that Tom was, in the court's words, "minimally involved" with Casper; that he saw Casper every other weekend but had historically only exercised his weekday parenting time about half of the time; that neither Tom nor Tom's sister—Casper's only other family in Chicago—was able to help Kasia with childcare in an emergency; and that in contrast Kasia had close, familial relationships with over a dozen friends in New York City who would constitute a strong support network for her. The court noted that Tom had found the means to drive or fly back and forth to New York frequently when he and Kasia were first dating.

¶ 59    The court emphasized Kasia's testimony that she felt isolated and alone in Chicago; that Tom, in the court's words "became increasingly controlling and suspicious" of her over time; that the police were called to the parties' home on several occasions; that Tom's ex-girlfriend had obtained an order of protection against him; and that Tom had pleaded guilty to a criminal conviction of stalking. The court also noted that Kasia's testimony was largely substantiated by Tom's own acknowledgements on the stand, by the testimony of Kasia's friend Matt, and by a written job offer from her prospective employer in New York.

¶ 60    Tom's stated reasons for objecting to the relocation were his fear that he would not be able

17

to visit with Casper as often and his desire for Casper's education to take place in the Chicago area. As the court noted, however, he testified that he would still object to relocation, even if he was awarded significantly more parenting time, he trusted Kasia's judgment in the selection of a school, and he had made no effort to research potential schools in Chicago or New York. "While it is clear that [Tom] loves his son," the court explained, "and is concerned about the effect a move would have on his relationship, the record [did] not support that [Tom's] objection as a whole [was] based on good faith."

¶ 61    Tom now argues that the court "exhaustively detailed" Kasia's testimony and "almost entirely disregarded" his own, failing to acknowledge areas where the two conflicted. Tom insists, for example, that there was "no evidence" that Kasia spent holidays with her friends, that Casper had relationships with the children of those friends, that Kasia's friends would help her with childcare, or that Kasia would be able to secure an affordable apartment in her old neighborhood. The evidence did establish, however, that Kasia spent time with her friends before moving to Chicago and that she would presumably begin doing so again if she moved to New York. Her friend Matt agreed that she had friends in New York who would function as a support system for her. And her friend Beata told the GAL that she was available to provide free childcare for Casper. Tom's complaint is not so much that there was no evidence to support the court's findings, but rather that the only evidence was the testimony and representations of Kasia and her friends. But it is the role of the trial court, when serving as the trier of fact, to assess the credibility of witnesses. We defer to the court's findings precisely because it had "significant opportunity to observe both parents and the child" and is thus best able "to assess and evaluate their temperaments, personalities, and capabilities." *Eckert*, 119 Ill. 2d at 330. Here, the trial court clearly believed Kasia's testimony, and we will not second-guess its decision to do so.

¶ 62 Tom also insists that the court overlooked certain evidence. The fact, for instance, that once Thursdays were designated as his regular night for weekday parenting time, he took that entire day off to spend with Casper. The court did not overlook this fact. It noted, however, that this was a relatively recent development and questioned why Tom could not have adjusted his work schedule to make seeing Casper a priority sooner. Tom does not see himself as a "minimally involved father" because, as everyone agrees, he loves his son very much. Evidence was presented at trial, however, establishing that Kasia's role in Casper's day-to-day life is significantly greater than Tom's, and not always for reasons that were outside of Tom's control. Tom is also upset that the court did not specifically note that he always made child support payments on time in its written decision. But this was never a disputed issue. The court made clear that Kasia needed additional support in her life, besides money, that Tom could not provide for her in Chicago.

¶ 63 Tom also argues that the court's summary of the couple's rocky marriage and encounters with the police before they separated cast him in a poor light when in fact Kasia was sometimes the one who acted improperly. While there was evidence of poor conduct by both parents, the parties' divorce was final several years ago. The only question now is what is in Casper's best interests. The serious difficulties his parents have experienced trying to get along when they are in close proximity to one another is relevant to the question of relocation, regardless of whose "fault" those difficulties were. So too is Kasia's testimony that Tom's controlling actions contributed to the isolation she feels in Chicago, a primary reason for her desire to return to New York. The court's findings that these first two factors weigh in favor of relocation are not against the manifest weight of the evidence.

¶ 64 As to the third factor, the history and quality of each parent's relationship with the child, the court agreed with the GAL that although both of Casper's parents love him deeply, he is more

closely bonded with Kasia. Tom has exercised his weekend parenting time consistently, but his work schedule has largely prevented him from exercising weekday parenting time. Tom has never asked to have telephone or video conference calls with Casper during the week, and he is now "largely not involved" in the day-to-day aspects of Casper's care. As the court noted, Kasia ultimately cannot rely on Tom to provide childcare for Casper if she falls ill or has an emergency. The court thus found that this factor supports relocation.

¶ 65     Tom insists that the trial court misunderstood or misreported his testimony on a number of small details, including whether he knew the name of the director at Casper's daycare, whether he could give a basic recipe for a meal he had prepared for Casper during their visits, and whether Casper had had a "big" birthday party or celebrated the occasion only with Tom. We acknowledge that, in situations like this where the parties and their witnesses must testify through interpreters, some details may not be conveyed accurately. Even if the court construed the testimony exactly as Tom has represented it on each of these relatively minor points, however, we fail to see how it would have altered the overall picture. The court's finding that this factor weighed in favor of relocation was supported by substantial evidence.

¶ 66     Regarding the fourth factor, Casper's educational opportunities, the court noted that the schools in New York were ranked only slightly higher than those in Chicago. Because Casper would not attend kindergarten until fall 2023, the primary immediate benefit of relocation was that pre-K schooling is free in New York and Kasia would have close friends nearby who could also provide free childcare when needed. The court noted that both parents were interested in enrolling Casper in a Polish-language school. Tom testified that the closest one in Chicago was 30 minutes from where he lived. A Polish-language school was within walking distance of the apartment Kasia anticipated renting in New York. The court found this factor to be neutral.

¶ 67    Tom claims the court "neglected to note troubling testimony by Kasia" that "she preferred Casper's New York school because his classmates would be white." Kasia's testimony was that she preferred Casper attend a school with children who had "the same background" as him. At the time of trial, he went to daycare mostly with other Polish American children. She acknowledged on cross-examination that this would mean Casper's classmates would primarily be white children of European descent. But she stated that "[o]f course" Casper would also be exposed in New York City, just as in Chicago, to people of many other races and ethnicities. As first-generation immigrants from Poland, both of Casper's parents expressed a strong desire for him to be exposed to the Polish language and culture. Having reviewed Kasia's testimony in context, we find no reason to disturb the trial court's finding regarding the neutrality of this factor.

¶ 68    Regarding the fifth factor, the presence or absence of extended family, the court noted that it was "undisputed that [Kasia had] primary responsibility for Casper" and that she "need[ed] help and support," which was more available to her from her friends in New York than from Tom and his sister Ann in Chicago. The court did not find Ann to be a credible witness. She had never provided daycare for Casper, did not have any type of relationship with Kasia, and since her own divorce in the summer of 2021, had not attempted to coordinate parenting schedules with Tom so that her son and Casper could spend more time together. The court agreed with the GAL that there would be no substantial adverse impact on Casper if he did not see his aunt and cousin as frequently as he did while living in Chicago. The court thus concluded that this factor favors relocation.

¶ 69    We disagree with Tom that the trial court "inappropriately prioritized Kasia's friends above Casper's blood relatives." We see no reason why such individuals should not be considered "extended family" under this factor, particularly in situations like this, where most of the child's biological relatives live in another country. Tom's insistence that nothing in the record supports

21

Kasia's purportedly close relationship with her friends in New York is again based on his refusal to accept the fact that the trial court found Kasia's own testimony compelling. The trial court's finding that this factor favors relocation is not against the manifest weight of the evidence.

¶ 70    The court found that the sixth factor, the anticipated impact of relocation on the child, also favored Kasia. Direct benefits to Casper included the fact that he could spend time with the children of Kasia's friends in New York and private health insurance coverage. The court also agreed with the GAL that Casper would indirectly benefit from Kasia's improved circumstances in a number of ways. On this point, the court cited our supreme court's observation in *Collingbourne* that "[t]he best interests of children cannot be fully understood without also considering the best interests of the custodial parent." *Collingbourne*, 204 Ill. 2d at 528.

¶ 71    Citing *In re P.D.*, 2017 IL App (2d) 170355, ¶¶ 34-36, Tom argues that with the enactment of section 609.2 of the Act, this court has moved away from a focus on the "trickle down" benefits a child enjoys when his or her primary caretaker's own life is improved. But cases decided after the enactment of section 609.2 have continued to recognize that "the life of a child and his custodial parent are intertwined." *Villarreal v. Medina*, 2021 IL App (1st) 201230-U, ¶ 104. As the court explained in *In re Marriage of Kavchak*, 2018 IL App (2d) 170853, ¶ 88, although the legislature intended for courts to emphasize the child's best interests over those of the custodial parent, "nothing in *P.D.* prohibits a court from considering an enhancement to the custodial parent's quality of life. In fact, in deciding a motion to relocate, section 609.2(g)(11) [750 ILCS 5/609.2(g)(11) (West 2020)] directs the court to consider 'any other relevant factors bearing on the child's best interests.' " *Id.*

¶ 72    The court also did not, as Tom insists, completely fail to address the impact that separation from his father, aunt, and cousin would have on Casper. Nor did the court's inquiry "beg[i]n and

22

end[ ]" with a consideration of Kasia's own happiness. The court concluded that, given their very close bond and Kasia's outsized role in Casper's life thus far, many of the things that would improve her quality of life would also improve his. Tom has not convinced us that this was an improper consideration or that the court's finding that this factor favors relocation is against the manifest weight of the evidence.

¶ 73    Tom has not appealed the trial court's findings, with respect to the seventh, eighth, and ninth factors that a reasonable allocation of parental responsibilities could be fashioned that takes into account both parents' financial resources and the developmental level of the child and that the wishes of a child as young as Casper are not readily ascertainable. We agree with the trial court's findings on these factors.

¶ 74    On the tenth factor, minimization of the impairment to Tom's relationship with Casper, the trial court found that, contrary to Tom's assertions, Kasia tried to foster a good relationship between Tom and Casper and routinely communicated with him about all major events in Casper's life. The court thus considered this factor to be neutral. Tom complains that the court failed to acknowledge certain evidence bearing on this factor in its written decision. He points to incidents during the parties' marriage when he claims Kasia threatened to take Casper away from him; the time following their divorce when she took him to Ohio for Thanksgiving during what was supposed to be Tom's parenting time; and the "spurious child abuse claim" she filed against him. Based on these incidents, Tom insists that "there is at least some risk that Kasia will work to separate father and son." There was considerable evidence, however, that Tom and Kasia were generally able to co-parent effectively. They chose daycare providers together, communicated regarding Casper's doctor visits, and generally abided by their allocation of parenting time without court involvement. We find no compelling reason to believe that they will not be able to continue

doing so if Kasia and Casper move to New York or that the court's finding on this factor was against the manifest weight of the evidence.

¶ 75    The facts presented here are far removed from those in *Kimberly R. v. George S.*, 2021 IL App (1st) 201405, and *In re Marriage of Levites*, 2021 IL App (2d) 200552, cases Tom relies on. The mother in *Kimberly R.* repeatedly imposed additional restrictions and time limits on the father's visitations that were not required by court orders and routinely made excuses for why the child could not be brought around the father's family. *Kimberly R.*, 2021 IL App (1st) 201405, ¶¶ 6, 105. And the parties in *In re Marriage of Levites*, had a "rancorous relationship" that was "marred with allegations of abusive behavior," drug use, and a violent attack on the mother by a friend of the father's. *In re Marriage of Levites*, 2021 IL App (2d) 200552, ¶¶ 6, 7, 14-17, 81. Nothing in the record here demonstrates that Kasia will actively thwart Tom's ability to see his son if relocation is granted or that this case is similar to those cases where a petition for relocation was denied because of significant evidence that the moving parent would not be willing to minimize the impairment of the relationship between the child and the parent who opposed relocation.

¶ 76    In sum, after considering seven days of testimony as well as documentary evidence, the trial court did a careful and thorough job of considering each of the statutory factors. We cannot say that any of the court's findings on these factors, or its overall conclusion that relocation was in Casper's best interests were against the manifest weight of the evidence.

¶ 77                                    IV. CONCLUSION

¶ 78    For the above reasons, we affirm the trial court's February 14, 2022, order granting Kasia leave to relocate the parties' minor child Casper to New York.

¶ 79    Affirmed.